(Nos. 46753, 46763 cons.—

THE PEOPLE *ex rel.* ILLINOIS FEDERATION OF TEACHERS, AFT, AFL-CIO *et al.,* Appellants, v. GEORGE W. LINDBERG, Comptroller, *et al.,* Appellees.—AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS *et al.,* Appellants, v. DANIEL WALKER, Governor, Appellee.

*Opinion filed March 24, 1975.*

J. Dale Berry, of Kleiman, Cornfield and Feldman, of Chicago, for appellants.

William J. Scott, Attorney General, of Chicago (Herbert L. Caplan, Assistant Attorney General, of counsel), for appellees.

Lawrence Jay Weiner, of Chicago, for *amicus curiae* Illinois Education Association.

Robert Plotkin and H. Douglas Laycock, both of Chicago, for appellants.

William J. Scott, Attorney General, of Chicago (Herbert L. Caplan, Assistant Attorney General, of counsel), for appellee.

Lawrence Jay Weiner, of Chicago, for *amicus curiae* Illinois Education Association.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

These consolidated appeals from the circuit court of Cook County involve class actions by members of several teachers' pension funds and others generally challenging the constitutional and statutory legality of Governor Daniel Walker's item reduction of certain appropriations made to these pension funds for the fiscal year 1974. The respective trial courts dismissed the complaints, and we granted direct appeal. 50 Ill.2d R. 302(b).

In cause No. 46753 plaintiffs, the Illinois Federation of Teachers, and certain retired teachers and active teachers, filed a multicount complaint against George W. Lindberg (State Comptroller) and Alan J. Dixon (State Treasurer) seeking a writ of *mandamus* to compel payment of certain amounts to the respective teacher pension funds. The complaint further sought declaratory relief against Governor Walker's item appropriation reductions. The only matter appealed is the dismissal of the action seeking the declaratory relief.

The complaint in substance involved three teachers' pension plans which are described by plaintiffs as compulsory in nature. The first pension program was designated in the complaint as the "Downstate System." (Ill. Rev. Stat. 1973, ch. 108½, par. 16—101 *et seq.*) Plaintiffs alleged that the requisite statutory pension provisions required the State to make contributions to the "Downstate System" of $205,600,000 for the fiscal year 1974 as was determined in a prior action before the Illinois Court of Claims. That court had concluded that a contract existed between the teachers and the State as evidenced by constitutional and statutory provisions hereinafter enumerated. The complaint further alleged that the State was indebted to the "Downstate System" for a total amount of nearly 2.15 billion dollars which had developed from past years of inadequate funding. Plaintiffs averred that in an effort to discharge this obligation the General Assembly appro-

priated the fiscal amount designated by the Court of Claims. However, the Governor, in the exercise of his constitutionally delegated authority, reduced the amount to $96,000,000, and the General Assembly did not restore the original amount by a majority vote of each house of the legislature as constitutionally permitted. Ill. Const. (1970), art. IV, sec. 9(d).

The second pension plan herein involved was termed the "Universities Systems" plan. (Ill. Rev. Stat. 1973, ch. 108½, par. 15—101 *et seq.*) The complaint alleged the Court of Claims had certified that the State's indebtedness to this pension fund for the 1974 fiscal year was $55,882,691 and that the past overall State indebtedness is .51 billion dollars. The General Assembly appropriated $66,908,000 for the "Universities Systems" fund, but this amount was reduced by the Governor to $20,190,000. The General Assembly failed to restore the amount by which the appropriation had been reduced.

The third pension plan, which was not involved before the Court of Claims, was described in the complaint as the "Chicago Fund." (Ill. Rev. Stat. 1973, ch. 108½, par. 17—101 *et seq.*) The complaint alleged that the State debt to this plan for fiscal year 1974 was $23,666,799 and the past indebtedness totalled .84 billion dollars. The General Assembly, to meet the current obligations and to amortize past debt, appropriated $57,707,000 for the fiscal year, which the Governor reduced to $27,000,000. The General Assembly failed to restore the reduced amount.

Cause No. 46763 was a separate class action filed on behalf of various university teaching associations and certain members and beneficiaries of the "Universities Systems" pension plan. These plaintiffs sought the same declaratory relief as requested in cause No. 46753. This complaint, however, with greater specificity set forth the General Assembly appropriations to this pension fund. The complaint alleged the appropriation for current expenditures was $54,759,100 and this was reduced to

$20,190,000 by the Governor. A separate appropriation bill for $12,138,599 was designed to amortize accrued unfunded liability, but this bill was vetoed.

It was averred that the Governor's reason for reducing the pension appropriation "was consistent with the historically sound system of the Federal Social Security System." No allegation was advanced in either complaint that those presently entitled to receive pension benefits were not receiving the necessary monies.

The possibility exists that criticism could arise due to the fact that members of this court might be affected by the decision due to our participation in the judicial retirement pension provisions of the Pension Code. (Ill. Rev. Stat. 1973, ch. 108½, par. 18–101 *et seq.*) But in an analogous case the United States Supreme Court stated:

> "*** Because of the individual relation of the members of this court to the question *** we cannot but regret that its solution falls to us; and this although each member has been paying the tax in respect of his salary voluntarily and in regular course. But jurisdiction of the present case cannot be declined or renounced. The plaintiff was entitled by law to invoke our decision on the question as respects his own compensation, in which no other judge can have any direct personal interest; and there was no other appellate tribunal to which under the law he could go." *Evans v. Gore* (1920), 253 U.S. 245, 247-48, 64 L. Ed. 887, 40 S. Ct. 550.

In asserting that the Governor's action exceeded his constitutional authority all plaintiffs rely on section 5 of article XIII of the 1970 Constitution, which they contend was adopted precisely to forestall the possible insolvency of the pension system. This provision reads:

> "Membership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an

> enforceable contractual relationship, the benefits of which shall not be diminished or impaired."

They argue this provision creates a contractual relationship between the State and participants in the pension systems which the Governor may not infringe by use of his power to reduce or veto appropriations.

In *Peters v. City of Springfield* (1974), 57 Ill.2d 142, we had occasion to consider this provision. There a home-rule municipality lowered the retirement age for its firemen, which, under the appropriate section of the Pension Code (Ill. Rev. Stat. 1971, ch. 108½, par. 4–109), would probably decrease the pension amount to be received. In upholding the action of the municipality we examined the constitutional convention debates pertaining to this provision and concluded "that the purpose and intent of the constitutional provision was to insure that pension rights of public employees which had been earned should not be 'diminished or impaired' but that it was not intended, and did not serve, to prevent the defendant City from reducing the maximum retirement age, even though the reduction might affect the pensions which plaintiffs would ultimately have received." 57 Ill.2d 142, 152.

We have again examined the debates concerning the application of this provision to the necessity of providing certain funding to the various pension plans during a particular fiscal period. As recognized in *Peters,* the tenor of the debates was primarily concerned with assuring members of pension plans that they would receive the money due them at the time of their retirement. The question of the specific funding of compulsory pension programs was discussed, and Delegate Kinney, a cosponsor of the provision, stated: "It was not intended to require 100 per cent funding or 50 per cent or 30 per cent funding or get into any of those problems, aside from the very slim area where a court might judicially determine that imminent bankruptcy would really be impairment." (4 Record of Proceedings, Sixth Illinois Constitutional Convention

2929; also see 4 Proceedings 2926.) Comparable interpretations of the provision's effect as applied to these appeals were echoed by Delegates Lyons, Whalen (4 Proceedings 2929) and President Witwer (4 Proceedings 2932). While Delegate Green expressed the opinion that the legislature should adequately fund the pension systems in accordance with the actuarial principles (4 Proceedings 2925, 2931), the convention debates do not establish the intent to constitutionally require a specific level of pension appropriations during a fiscal period. There is also no basis from which it might be argued that the provision was intended to restrict the Governor's constitutional authority to reduce or veto a pension appropriation measure. And it cannot be said that under the circumstances this constitutional provision affords plaintiffs the right to judicially circumvent the Governor's actions taken herein.

Plaintiffs also argue that these actions were commenced in order to secure the performance of the State's statutory funding obligations. It is the plaintiffs' position that the pertinent provisions of the Pension Code establish and define a contractual relationship between themselves and the State which obligates the State to fulfill its funding commitments. Plaintiffs argue that the respective pension statutes do not contain provisions that make the amount of State contributions subject to the political or fiscal exigencies of the Governor's budgetary priorities. They maintain that the clear intent of the statutes is to place the funding of the pension trusts upon a solid actuarial basis. Moreover, they conclude that the State's obligations were established by prior legislative action and the Governor's conduct, in effect, improperly operated to nullify pre-existing law.

Plaintiffs have strongly argued that this court adopt the "contract view" relating to this form of public-employee pension plan and have cited numerous cases from other jurisdictions in support of their position. As noted in the *Opinion of the Justices* (Mass. 1973), 303

N.E.2d 320, 326, the character of public-employee pension programs has not been definitely established (see also Cohn, *Public Employee Retirement Plans—The Nature of Employees' Rights,* 1968 U. Ill. L.F. 32) and an attempt to precisely define the nature of the relationship has been rejected (*Spina v. Consolidated Police and Firemen's Pension Fund Com.* (1964), 41 N.J. 391, 197 A.2d 169).

We must determine whether the participants or their beneficiaries under the respective sections of the Pension Code now at issue enjoy a present contractual right to enforce a specific level of funding to the plans. As previously noted, the pension systems involved in these consolidated appeals are compulsory in nature. (Ill. Rev. Stat. 1973, ch. 108½, pars. 15—134, 16—123(1), 17—130; see also *Gorham v. Board of Trustees of Teachers' Retirement System* (1963), 27 Ill.2d 593, 596.) In *Bergin v. Board of Trustees of Teachers' Retirement System* (1964), 31 Ill.2d 566, 574, we stated: "It has long been settled that compulsory participation in a statutory pension plan confers no vested rights, thus permitting amendment, change or repeal as the legislature sees fit."

Each teacher pension plan involved in this appeal is funded from teachers' compulsory contributions, State monies and investment income earned from these funds. The respective statutes each set forth the contributions requirements of their respective members. (Ill. Rev. Stat. 1973, ch. 108½, pars. 15—157, 16—152, 17—130.) To complement these funds the respective statutes contain provisions for employer contributions. (Ill. Rev. Stat. 1973, ch. 108½, pars. 15—155, 16—158, 17—127 and 17—128.) The complaint in cause No. 46753 alleges, and defendants do not dispute, that State contributions to these pension plans are obligations of the State (Ill. Rev. Stat. 1973, ch. 108½, pars. 15—156, 16—162).

In asserting their claim of a presently enforceable contractual right to a financially sound retirement system plaintiffs in cause No. 46753 claim that the statutory

provisions require State contributions for the pension systems to be made on an actuarial basis. In particular they direct our attention to the "Downstate System" providing that the amount of State contributions "shall be no less than 1.2 multiplied by members' contributions ***." Ill. Rev. Stat. 1973, ch. 108½, par. 16—158.

Plaintiffs in cause No. 46763 involving the "Universities Systems" argue that section 15—155 reflects the contractual concept and mandates certain appropriations to be made. In support of their position they cite a 1967 amendment to section 15—155 which reads as follows:

> "The contributions of employers from State appropriations for any fiscal year shall not be less than an amount which is required to fund fully the current service costs in accordance with actuarial reserve requirements as prescribed in paragraph (1) of this Section, plus interest at the prescribed rate on the unfunded accrued liabilities."
> Laws of 1967, at 4216-4217.

They construe the term "current service costs" to mean the actuarial requirements for contributions for the fiscal year necessary to enable the "Universities Systems" to pay the pensions of current employees as they retire.

We must reject the statutory basis upon which plaintiffs seek to establish a contractual relationship. Prior to the enactment of the Pension Code in 1963 and during a period of time when the decisions of this court clearly established no vested right in compulsory statutory pension plans for public employees, the predecessor provisions of the respective pension statutes were similarly drafted. Prior statutes reflected that State contributions were an obligation of the State. (Ill. Rev. Stat. 1961, ch. 122, par. 25—77; ch. 144, par. 104.) Before the adoption of the present Pension Code, the "Downstate System" also contained the provision relating to State contributions being set in an amount of 1.2 in excess of those contributed by the employees. (Ill. Rev. Stat. 1961, ch. 122, par. 25—67.) In addition, the statutory basis for estimating the amount of State contributions needed for a

fiscal year in the "Downstate System" has remained the same. Compare Ill. Rev. Stat. 1973, ch. 108½, par. 16—159, with Ill. Rev. Stat. 1961, ch. 122, par. 25—68.

The 1967 amendment to section 15—155 in the "Universities Systems" does not evidence the legislative intent ascribed to that revision by certain plaintiffs. We perceive no attempt to establish a vested contractual relationship by this revision, and there would appear to be no significant change in this regard from the predecessor to section 15—155. See Ill. Rev. Stat. 1961, ch. 144, par. 86.

In summary, had the legislature intended to establish a present contractual relationship when the Pension Code was enacted in 1963, thereby affording plaintiffs the possible statutory basis to challenge necessary appropriations, it would have been a simple matter to so state. (E.g., see Opinion of the Justices (Mass. 1973), 303 N.E.2d 320, 324.) Rather we are of the opinion that the provisions upon which plaintiffs rely to establish the contractual relationship were merely engrafted from prior pension laws which had been construed as not conferring a vested right.

Having found no presently existing contractual right created by statute upon which to base a challenge to appropriations reductions or item veto, we need not consider the implication of whether the Governor's action infringed the Federal or State constitutional guarantees against the impairment of contracts. U.S. Const., art. I, sec. 10; Ill. Const. (1970), art. I, sec. 16.

With regard to plaintiffs' claim that the Governor's action in effect resulted in the nullification of existing pension statutes, it is to be noted that section 9(d) of article IV of the 1970 Constitution plainly provides that "The Governor *may reduce or veto any item of appropriations* in a bill presented to him." (Emphasis added.) If an item is vetoed, the General Assembly, by the three-fifths vote of each house, may override the veto. (Ill. Const. (1970), art. IV, sec. 9(c).) If an appropriation is reduced in amount, the amount may be restored by a majority vote of

each house of the General Assembly. Ill. Const. (1970), art. IV, sec. 9(d).

While plaintiffs have cited numerous cases to the effect that a court may declare an executive veto void, the vast majority of those decisions involve situations where a governor reduced an appropriation item rather than vetoing it, thereby exceeding his authority delegated under the respective constitutional provisions which in most instances granted the authority only to veto an item. (*E.g., Fergus v. Russel* (1915), 270 Ill. 304; *Mills v. Porter* (1924), 69 Mont. 325, 222 P. 428.) This result would not occur under our present State Constitution.

Another case relied upon is *State ex rel. Nunez v. Baynard* (La. App. 1943), 15 So. 2d 649. The decision is inapplicable, for the amount of the appropriation vetoed by the Governor was specifically mandated by that State's constitution.

The only resembling case cited by plaintiffs is *Fitzsimmons v. Leon* (1st Cir. 1944), 141 F.2d 886. There a governmental official's salary had been previously established by statute. In subsequent appropriation bills the Governor lessened the statutorily specified amount by utilization of his authority to reduce appropriations. The court's rationale, as relevant to these appeals, seems to have been resolved on its determination that the Governor's action was not the mere reduction of an appropriation bill, as here, but rather an attempt to modify general legislation.

We do not find *Leon* to be persuasive for the proposition advanced by plaintiffs. As related to these appeals, the court in *Leon* premised its constitutional basis upon authorities which do not support its conclusion. In *Bengzon v. Secretary of Justice* (1936), 299 U.S. 410, 81 L. Ed. 312, 57 S. Ct. 252, the item which was vetoed was not even construed as an appropriation measure. In the *Opinion of the Justices* (1936), 294 Mass. 616, 2 N.E.2d 789, the court was presented with a situation wherein the

Governor transferred an appropriation to a separate fund, thereby transgressing his constitutional authority.

But even if *Leon* is to be considered as affording a Federal constitutional basis for plaintiffs' challenge, this court is not bound by that case. (*People v. Stansberry* (1971), 47 Ill.2d 541, 544.) Rather we adhere to this court's prior decision in *People ex rel. Millner v. Russel* (1924), 311 Ill. 96. In *Millner* the relator was appointed an assistant Attorney General. A previously enacted statute fixed his salary at a certain amount, and the necessary funds were appropriated by the General Assembly. The Governor vetoed this salary appropriation, and the relator filed an original action for *mandamus* to compel payment of his statutorily set salary. The 1870 Constitution (art. V, sec. 16) empowered the Governor to veto an appropriation item. The court sustained the Governor's action, stating that the Constitution made no distinction in the type of salary appropriation bill presented and that the Governor could therefore exercise his constitutionally delegated veto power. Similarly, under the circumstances presented in these appeals, we conclude that the Governor could properly utilize his veto or item-reduction authority over the pension appropriation bills.

Plaintiffs have asserted that the respective pension systems are inadequately funded. The question of the specific fiscal appropriations necessary to meet these deficiencies is one which, at this time, should be directed to the legislature.

Accordingly, the judgments of the circuit court of Cook County are affirmed.

*Judgments affirmed.*