*358
 
 OPINION OF THE COURT
 

 Smith, J.
 

 The issue here is whether chapter 210 of the Laws of 1990, which changes the funding method for New York State Retirement Systems from an Aggregate Cost (AC) method to a Projected Unit Credit (PUC) method, violates article V, § 7 of the New York State Constitution, requiring that a system member’s benefits not be "diminished or impaired.” Supreme Court granted the plaintiffs’ motions for summary judgment declaring sections 1 through 7 of chapter 210 unconstitutional. The Appellate Division affirmed.
 

 The retirement system for public employees in New York State resulted from a report of the New York State Commission on Pensions issued in 1920
 
 (see,
 
 L 1918, ch 414, as amended by L 1919, ch 22). The report recommended the establishment of a retirement system for State and municipal employees and that the management of the system and the direction of the investment of funds be vested with the State Comptroller (Report of Commn on Pensions, 1920 NY Legis Doc No. 92, at 27). The Legislature adopted a plan for State employees (L 1920, ch 741) which was extended to include county, city, town and village employees
 
 (see,
 
 L 1922, ch 591; L 1923, ch 708).
 

 At the present time there are three pension funds for public employees in New York State. The largest fund is the Common Retirement Fund (CRF) which is composed of the New York State and Local Employees’ Retirement System (ERS) and the New York State Police and Fire Retirement System (PFRS). It provides retirement, death and disability benefits to approximately 800,000 past and present employees and their beneficiaries. The other two systems are the New York City Retirement Fund and the New York State Teachers’ Retirement Fund.
 

 The CRF is funded by contributions made by employee members, the State, and participating local government employers. Between 1921 and 1990, by legislative mandate, the method of funding was the AC method. That method proceeds in the following fashion:
 

 1. The total amount of funding necessary to pay all expected benefits, including future benefits, for all of the employees in the system is computed on an annual basis.
 

 2. The present value of total projected benefits for
 
 *359
 
 all employees is reduced by the sum of plan assets and the present value of all future employee contributions.
 

 3. The remainder is then allocated to each of the employers in order to produce the rate of contribution against payroll for a given year.
 

 The AC method thus results in the funding of some benefits before they are accrued.
 

 Chapter 210 requires the funding of benefits only when they accrue. Thus the contributions that have been put into the CRF exceed benefits actually accrued and become a so-called surplus which is returned to the governmental entity making the annual contribution. What this means is that for a number of years the governmental entities will pay a reduced annual contribution to the CRF or none at all. It is undisputed that chapter 210 was enacted not to protect the retirement funds earned by members and beneficiaries of the system but to deal with the budget crises being experienced by governmental entities in New York State.
 

 Sections 6 and 7 of chapter 210 also prescribe the use of a five-year stock valuation method for fiscal years 1988-1989 and 1989-1990. In order to determine employer contributions on an annual basis, a so-called smoothing technique, or average of several years of stock market results, is used in order to account for fluctuations in stock. Prior to chapter 210, the Comptroller averaged stock market results over a four-year rather than five-year period, thus increasing the annual cost to employers.
 

 Appellant State of New York argues that chapter 210 does not violate article V, § 7, the Impairment Clause of the New York State Constitution. It argues further that the Legislature has reserved to itself the determination of the funding method of the CRF, that the PUC method is actuarially sound and that sections 6 and 7 of chapter 210 which prescribe a return to a five-year stock valuation smoothing method for the fiscal years 1988-1989 and 1989-1990 do not impair the source of funds for pension benefits. Respondents argue that article V, § 7 gives to the fund trustee, the Comptroller, the right to choose the funding method, that chapter 210 diminishes and impairs the CRF and that the Comptroller now determines on an annual basis only the amount of contributions which he deems necessary to protect the benefits of the fund.
 

 Turning first to the argument on impairment, we conclude
 
 *360
 
 that chapter 210 violates article V, § 7 of the New York State Constitution. That section reads:
 

 "[Membership in retirement systems; benefits not to be diminished nor impaired]
 

 "After July first, nineteen hundred forty, membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired” (adopted Nov. 8, 1938, eff Jan. 1, 1939).
 

 Thus article V, § 7 establishes a contractual relationship between the employee and the retirement system in which benefits cannot be diminished or impaired.
 

 The Comptroller’s authority as trustee of these retirement benefits was discussed and upheld by this Court in
 
 Sgaglione v Levitt
 
 (37 NY2d 507). There, acknowledging the Comptroller’s role as trustee of certain retirement funds as authorized by statute, this Court declared section 14 of the New York State Financial Emergency Act for the City of New York unconstitutional to the extent it violated section 7 of article V of the State Constitution. That constitutional provision was violated by the statute’s attempt to dictate to the Comptroller a scheme of purchasing newly created bonds using moneys from the ERS and the PFRS. Notably, we indicated that notwithstanding whether the scheme was "good, indifferent, or bad[,] [t]he ultimate difference is between authority to invest and a mandatory direction to invest in certain securities * * * whether or not the State Comptroller deems it advisable”
 
 (id,.,
 
 at 513). After dismissing as immaterial the existence of taxes levied specifically to protect the retirement benefits, this Court further noted that the critical inquiry involved whether the "reserve funds * * * [would] be impaired by depriving the State Comptroller of freedom to exercise his independent judgment whether to invest in [the] bonds”
 
 (id.,
 
 at 513-514). This Court answered that inquiry in the affirmative. Similarly, where the State Comptroller here has been divested of his autonomous judgment as to whether the PUC method is preferable to the AC method, we hold that section 210 violates the Nonimpairment Clause.
 

 Appellant states that under article V, § 1 of the New York State Constitution, the Legislature is authorized to define the Comptroller’s "powers and duties”, a responsibility this Court recognized in
 
 Matter of New York Pub. Interest Research
 
 
 *361
 

 Group v New York State Thruway Auth.
 
 (77 NY2d 86, 89), and that the Comptroller was never statutorily empowered to choose the funding method for the retirement system. Distinguishing between the Comptroller’s role as trustee and administrative head of the retirement system and what appellant argues has always been the Legislature’s power to determine the system’s funding method, appellant contends that Retirement and Social Security Law §§ 13 and 313 limit the Comptroller’s duties to that of management, investment and disbursement of the assets of the retirement fund. Neither of these Retirement and Social Security Law provisions limits the Comptroller’s duties in a manner inconsistent with the exercise of his duties as trustee, which, as we held in
 
 Sgaglione,
 
 requires that system members have the benefit of the Comptroller’s independent judgment.
 

 Moreover, in
 
 Sgaglione,
 
 we indicated that "[cjlose examination is therefore required of any radical change in means chosen to maintain the integrity and security of the sources from which the concededly protected benefits are to be paid”
 
 (Sgaglione v Levitt,
 
 37 NY2d 507, 512,
 
 supra).
 
 Chapter 210 implements a "radical change.” The statute depletes several years of accrued retirement benefits involving millions of dollars and arguably destabilizes the fund. Indeed, even the Mercer Report (Actuarial Study to Compare Effects of Change in Actuarial Cost Method from Aggregate Cost Method to Projected Unit Credit Cost Method, by William M. Mercer, Inc. [1990]), lauded extensively by appellant, in addition to indicating the extreme volatility of the PUC method, warns that the amortization procedure inherent in the present PUC method creates an inappropriate level of risk. Such risk, compared to the stability of the AC method, in place without incident since 1921, results in a "radical change.”
 

 Appellant contends that even
 
 Sgaglione
 
 recognized the Legislature’s "flexibility to change the manner of paying contributions, to fund deficiencies in actuarial reserve, and to authorize the investment of the funds”
 
 (id.,
 
 at 512). Such flexibility, however, is not unfettered
 
 (id.).
 

 Second, similar to the Comptroller’s fiduciary role as trustee in regard to these benefits is the State’s fiduciary duty to the participants in the retirement fund, to act in their best interests in exercising its limited oversight of the funds. As we indicated,
 
 supra,
 
 article V, § 1 of the New York State Constitution authorizes the State to circumscribe the Comptroller’s
 
 *362
 
 powers and duties. It is also unquestioned that the Legislature maintains some independent authority regarding the fund
 
 (see,
 
 Retirement and Social Security Law § 23 [delineating,
 
 inter alla,
 
 employer contribution rates and administration contributions]). Where the State maintains such authority in regard to the actual trustee of the funds, and specifically prescribes procedures for contributing to the benefits, concomitant with that authority is the State’s duty to act in a manner consistent with the goal of the "protection” of these funds as required by article V, § 7 of New York’s Constitution. The State must show, like any other trustee or fiduciary, that it has not breached that duty.
 

 Thus, in those areas where the Legislature has some flexibility with respect to the administration of the fund
 
 (see, Sgaglione v Levitt,
 
 37 NY2d 507, 512,
 
 supra),
 
 it yet remains bound by the same fiduciary duties required of any other acting in a fiduciary capacity, those of protecting the interests of the beneficiary. Here, it is uncontroverted that the only factor the Legislature considered when it chose to alter the funding method was that of the fiscal crisis facing the State.
 

 Third, in seeking to uphold chapter 210, the State places reliance upon the Mercer Report for the proposition that funding under both the AC method and the PUC method is adequate. While the Mercer Report concluded that "both cost methods [AC and PUC] are appropriate,” it also concluded that "the Aggregate cost method may be preferred since it provides for smoother cost increases.” The Mercer Report does not provide the assurance of stability and nonimpairment of the CRF which appellant claims it does. That report bolsters plaintiffs’ claim that the PUC method impairs their retirement benefits. The Report indicates,
 
 inter alla,
 
 the following:
 

 (1) Under PUC, "[b]enefit security is not an issue in the change in actuarial cost methods, provided the employer is able to make the higher contributions required in later years”;
 

 (2) "The PUC method is twice as volatile as the Aggregate Method. If experience is particularly adverse it may be difficult for the employers to meet the contribution requirements”;
 

 (3) "The current PUC amortization method is one that we believe can do harm to the Systems. Due to the well funded condition of the Systems and the strain on governmental budgets, we are con
 
 *363
 
 cerned that the amortization method provides a level of risk which is inappropriate.”
 

 Fourth, sections 6 and 7 of chapter 210 of the Laws of 1990 impair the means designed to assure benefits to public employees by depriving the Comptroller of his personal responsibility to maintain "the security of the sources of benefits” of the pension fund
 
 (see, Sgaglione v Levitt,
 
 37 NY2d 507, 512,
 
 supra).
 
 That is not to say that the funding method used in pension funds of public employees may never change. However, the express authority to "adopt and * * * amend, from time to time, rules and regulations for the administration and transaction of the business of the retirement system and for the custody and control of its funds” rests largely with the Comptroller, as trustee of the pension funds (Retirement and Social Security Law § 11 [a];
 
 see also,
 
 Retirement and Social Security Law §§ 13, 313).
 

 In sum, chapter 210 impairs the benefits of the existing pension fund. Said legislation allows employers to deplete moneys in the existing pension fund by reducing the amount of employer contributions. Employers are allowed a credit of a portion of the existing moneys, and need not contribute to the pension until the reserved moneys are drastically reduced. To later replenish the fund, employers and employees must increase the amount of their contributions to the pension fund. As such, the reserve moneys will not be available for immediate investment, the return on investment of moneys in the existing fund will be significantly decreased, and the additional security provided by the reserve moneys in the pension funds will be impaired.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Simons, Titone, Hancock, Jr., and Bellacosa concur; Judge Levine taking no part.
 

 Order affirmed, with costs.