NOTICE: Under Supreme Court Rule 367 a party has 21 days after the

filing of the opinion to request a rehearing. Also, opinions are

subject to modification, correction or withdrawal at anytime prior

to issuance of the mandate by the Clerk of the Court. Therefore,

because the following slip opinion is being made available prior to

the Court's final action in this matter, it cannot be considered

the final decision of the Court. The official copy of the following

opinion will be published by the Supreme Court's Reporter of

Decisions in the Official Reports advance sheets following final

action by the Court.

                                    

                 Docket No. 79592--Agenda 11--May 1996.

    JAMES McNAMEE et al., Appellees, v. THE STATE OF ILLINOIS et al.,

                               Appellants.

                     Opinion filed October 18, 1996.

                                    

     JUSTICE NICKELS delivered the opinion of the court:

     In this appeal, we decide whether an amendment to section 3--

127 of the Illinois Pension Code (Pub. Act 87--1265, eff. January

25, 1993 (amending 40 ILCS 5/3--127 (West 1992))) violates section

5 of article XIII of the Illinois Constitution of 1970 (Ill. Const.

1970, art. XIII, §5). Plaintiffs include the Illinois Police

Pension Fund Association, the Palos Heights and Streamwood police

pension funds and several current and retired police officers from

various municipalities throughout Illinois. Plaintiffs filed a

complaint in the circuit court of Cook County seeking declaratory

and injunctive relief against the defendants, the State of

Illinois, Governor Jim Edgar, and the Director of Insurance,

Stephen Selcke. The circuit court granted plaintiffs' motion for

summary judgment, finding that the amendment to section 3--127

diminished and impaired the contractual rights of the pension fund

participants in violation of the Illinois Constitution. Defendants

appealed directly to this court pursuant to Supreme Court Rule

302(a) (134 Ill. 2d R. 302(a)). We reverse.

                                BACKGROUND

     The Illinois Pension Code (40 ILCS 5/1--101 et seq. (West

1994)) codifies laws relating to the creation and maintenance of

pension funds for the benefit of state and municipal employees and

their dependents. This appeal involves article 3 of the Pension

Code, which applies to the maintenance of police pension funds by

municipalities with populations of 500,000 and under. 40 ILCS 5/3--

101 et seq. (West 1994). These police pension funds are financed

through employee salary deductions and municipal tax levies. 40

ILCS 5/3--125 (West 1994). At issue is an amendment to section 3--

127, which involves the accumulation of a reserve to pay off a

fund's accrued liabilities. Prior to January 25, 1993, section 3--

127 provided:

               "Reserves. The board shall establish and maintain a

          reserve to insure the payment of all obligations incurred

          under this Article. The reserve to be accumulated shall

          be equal to the estimated total actuarial requirements of

          the fund.

               If a pension fund has a reserve of less than the

          accrued liabilities of the fund, the board of the pension

          fund, in making its annual report to the city council or

          board of trustees of the municipality, shall designate

          the amount needed annually to insure the accumulation of

          the reserve to the level of the fund's accrued

          liabilities over a period of 40 years subsequent to

          January 1, 1980, for pension funds then in operation, or

          subsequent to the date of establishment in the case of a

          fund created thereafter, so that the necessary reserves

          will be attained over such a period." 40 ILCS 5/3--127

          (West 1992).

     The General Assembly amended section 3--127 effective January

25, 1993 (Pub. Act 87--1265, eff. January 25, 1993). As a result of

that amendment, the second paragraph of section 3--127 was changed

to provide:

               "If a pension fund has a reserve of less than the

          accrued liabilities of the fund, the board of the pension

          fund, in making its annual report to the city council or

          board of trustees of the municipality, shall designate

          the amount, CALCULATED AS A LEVEL PERCENTAGE OF PAYROLL,

          NEEDED ANNUALLY TO INSURE THE ACCUMULATION OF THE RESERVE

          TO THE LEVEL OF THE FUND'S ACCRUED LIABILITIES OVER A

          PERIOD OF 40 YEARS FROM JULY 1, 1993 FOR PENSION FUNDS

          THEN IN OPERATION, or from the date of establishment in

          the case of a fund created thereafter, so that the

          necessary reserves will be attained over such a period."

          (Emphasis added.) 40 ILCS 5/3--127 (West 1994).

This amendment changed the funding of police pensions in two ways.

First, the amendment changed the beginning date of the 40-year

amortization period from January 1, 1980, to July 1, 1993. Second,

the amendment changed the method of computing the annual amount

required to amortize the unfunded accrued liability from a level

dollar amount to a percentage of payroll.

     Plaintiffs filed a complaint in the circuit court seeking

declaratory and injunctive relief and alleging that the amendment

violated the Illinois Constitution. Specifically, plaintiffs

alleged that the amendment violated section 5 of article XIII,

which provides:

               "Membership in any pension or retirement system of

          the State, any unit of local government or school

          district, or any agency or instrumentality thereof, shall

          be an enforceable contractual relationship, the benefits

          of which shall not be diminished or impaired." Ill.

          Const. 1970, art. XIII, §5.

Plaintiffs' complaint alleges that the refinancing allowed by the

amendment to section 3--127 diminishes and impairs the pension

benefits of participants because it will allow municipalities to

contribute lower initial annual contributions to the police pension

funds, thereby making the funds less secure.

     Plaintiffs subsequently filed a motion for summary judgment.

In support of the motion, plaintiffs submitted the affidavit of

Arthur Tepfer, who is a professional actuary. In his affidavit,

Tepfer states that the amendment to section 3--127 will allow

municipalities to defer contributions until later years. Under this

new funding method, Tepfer opines that police pension funds will be

detrimentally affected because municipal contributions will be

initially insufficient to pay the interest on a particular fund's

unfunded liability. Thus, under the new funding provision, pension

liabilities will increase dramatically in the early years and a

fund will have fewer assets, thereby producing a less secure fund.

In his affidavit, Tepfer concludes that the funding changes

diminish and impair the pension benefits of the funds'

participants.

     Plaintiffs further argued that the circuit court should follow

the reasoning in McDermott v. Regan, 82 N.Y.2d 354, 624 N.E.2d 985,

604 N.Y.S.2d 890 (1993), in which the highest court of New York

construed the protection afforded by a similar provision in the New

York Constitution (see N.Y. Const. of 1938, art. V, §7). At issue

was whether the legislature may force the comptroller, who is the

administrative head of New York's pension funds, to use a

controversial method of computing employer contributions.

McDermott, 82 N.Y.2d at 360, 624 N.E.2d at 988, 604 N.Y.S.2d at

893. The court held that the statute was unconstitutional because

it impaired pension benefits by divesting the state comptroller of

the autonomy necessary to act as an independent trustee of the

funds. McDermott, 82 N.Y.2d at 360, 624 N.E.2d at 988, 604 N.Y.S.2d

at 893. The court further held that the legislature violated its

fiduciary duty as a secondary trustee in changing the funding

method solely to alleviate the fiscal crisis in the state.

McDermott, 82 N.Y.2d at 361-63, 624 N.E.2d at 988-90, 604 N.Y.S.2d

at 893-95.

     In their reply to the motion for summary judgment, defendants

did not contest the nature of funding changes made by the

amendment. Instead, relying on the transcripts from the

constitutional convention, the defendants argued that section 5 of

article XIII only protects pension benefits and does not require

any particular method of funding. Defendants noted that in People

ex rel. Illinois Federation of Teachers v. Lindberg, 60 Ill. 2d

266, 271 (1975), this court reviewed the record of proceedings from

the constitutional convention and determined that the tenor of the

debates was concerned with protecting employee benefits, not

funding. As the amendment to section 3--127 did not serve to reduce

the benefits due any beneficiary, defendants argued there was no

violation of the constitution.

     The trial court granted plaintiffs' motion for summary

judgment. In so ruling, the trial court relied heavily on the

McDermott case and the opinion of plaintiffs' expert that the

funding changes diminish and impair the pension benefits of the

funds' participants. Defendants appealed directly to this court

pursuant to Supreme Court Rule 302(a) (134 Ill. 2d R. 302(a)). We

allowed the Illinois Municipal League to file a brief as amicus

curiae in support of defendants.

                                 ANALYSIS

     Defendants argue that the trial court erred in granting

plaintiffs' motion for summary judgment. Summary judgment is

appropriate where the pleadings, depositions, and admissions on

file, together with the affidavits, demonstrate that there is no

genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law. 735 ILCS 5/2--1005(c)

(West 1994). As defendants raise no factual issues, the sole issue

on appeal is whether the trial court properly determined as a

matter of law that the amendment to section 3--127 violated the

Illinois Constitution. The review of a summary judgment ruling is

an issue of law and our review is therefore de novo.  Busch v.

Graphic Color Corp., 169 Ill. 2d 325, 333 (1996); Crum & Forster

Managers Corp. v. Resolution Trust Corp., 156 Ill. 2d 384, 390

(1993).

     Our inquiry into the protection afforded to state and

municipal employees by our constitution appropriately begins with

the language of the provision itself. The plain language of section

5 of article XIII makes participation in a public pension plan an

enforceable contractual relationship and also demands that the

"benefits" of that relationship "shall not be diminished or

impaired." Ill. Const. 1970, art. XIII, §5. This court has held

that the contractual relationship is governed by the actual terms

of the Pension Code at the time the employee becomes a member of

the pension system. Di Falco v. Board of Trustees of the Fireman's

Pension Fund of the Wood Dale Fire Protection District No. One, 122

Ill. 2d 22, 26 (1988); Kerner v. State Employees' Retirement

System, 72 Ill. 2d 507, 514 (1978).

     Defendants do not dispute that section 5 of article XIII of

the Illinois Constitution creates contractual rights. Defendants

contend, however, that the provision creates a contractual right to

pension benefits, but does not encompass how those benefits are

funded. The defendants note that the language of the provision

specifically protects "benefits" and does not mention a particular

funding method. Plaintiffs, in contrast, argue that the "benefits"

that are protected by the constitution include the full benefits of

a contractual relationship under the Pension Code. Plaintiffs argue

that the amendment to section 3--127 violated their

constitutionally protected contractual right to the "benefit" of

the more secure fund created by the prior funding method.

     Any uncertainty in the protection afforded by section 5 of

article XIII is easily dispelled by an examination of the history

of the provision and the evils it was intended to address. Prior to

the adoption of the Constitution of 1970, Illinois adhered to the

traditional classification of pension plans as either mandatory or

optional. Where an employee's participation in a pension plan was

mandatory, the rights created in the relationship were considered

in the nature of a gratuity that could be revoked at will. See,

e.g., Bergin v. Board of Trustees of the Teachers' Retirement

System, 31 Ill. 2d 566, 574 (1964); Jordan v. Metropolitan Sanitary

District of Greater Chicago, 15 Ill. 2d 369, 382 (1958); Blough v.

Ekstrom, 14 Ill. App. 2d 153, 160 (1957). However, where the

employee's participation in a pension plan was optional, the

pension was considered enforceable under contract principles.

Bardens v. Board of Trustees of the Judges Retirement System, 22

Ill. 2d 56, 60 (1961); People ex rel. Judges Retirement System v.

Wright, 379 Ill. 328, 333 (1942). The primary purpose behind the

inclusion of section 5 of article XIII was to eliminate the

uncertainty surrounding public pension benefits created by the

distinction between mandatory and optional pension plans. 4 Record

of Proceedings, Sixth Illinois Constitutional Convention 2925

(comments of Delegate Green) (hereinafter cited as Proceedings).

This concern was exacerbated by the proposed creation of broad home

rule powers for municipalities, which some delegates feared could

lead municipalities into debt and result in their abandoning their

pension obligations to police officers and fire fighters. 4

Proceedings 2926.

     The transcripts from the convention make clear that the

purpose of the amendment was to clarify and strengthen the right of

state and municipal employees to receive their pension benefits,

but not to control funding. In the debates surrounding the

amendment, Delegate Parkhurst expressed his concern that the

provision may be construed as constitutionalizing the politically

sensitive area of pension funding:

               "Now here's--it seems to me--the fallacy of trying

          to constitutionalize this sort of a thing. First of all,

          the background in the legislature has been that many

          people who are entitled to a pension which is

          administered or given at the state level have come to

          Springfield and said, `Our pension is not fully funded.

          Our actuary tells us that you will have to have

          $2,200,000,000 in state money to put into a special fund

          to pay off the potential claims that may now be filed to

          get this particular pension or that particular pension

          when the benefits become due and payable to the

          retirees.'

               And the legislature has said, `For Heaven's sake, we

          don't have $2,200,000,000. Why can't you let us run it

          like the federal government runs the Social Security

          program, which is to pay the benefits out of the income

          as they become due.' And the proponents of 100 percent

          funding have said, `Nope, that's not good enough. We want

          you to put all the money there right now, and not wait

          until the payment comes due before you wrestle up the

          money to make the payment.'

               ***

               Now, the trouble with this amendment is, as I read

          it, that you would eliminate the argument

          constitutionally. You would mandate the General Assembly

          to put in 100 percent of the money to pay anybody's

          pension on anybody's actuarial projection right now,

          because it says, `the benefits of which shall not be

          diminished or impaired.' " 4 Proceedings 2926-27.

     In response to the concerns raised by Delegate Parkhurst, Vice

President Lyons asked for a clarification of the nature of the

protection afforded:

               "I would like to ask one of the sponsors of the

          amendment--I am a cosponsor of it myself--I THOUGHT that

          the purpose of this amendment was to give protection to

          those people who felt that they needed protection for

          their pension rights in the event that sweeping home rule

          powers were given to local governments. I recall

          receiving a flurry of letters and telephone calls early

          in the session when the local government articles began

          to be introduced from police and fire associations who

          were very fearful that a general grant of home rule

          powers to local governments might in some way impair

          their pension rights. I thought that all that this

          amendment was designed to do was to cure that. Now, if it

          does something else, or if the language needs to be

          cleaned up, that's one thing. But the genesis of the

          amendment, I thought, was simply to protect people who up

          until now have felt protected. I am aware of no movement

          to upfund all the funds--nobody's got that kind of money.

               I would just appreciate an answer from somebody who

          feels that he knows." (Emphasis in original.) 4

          Proceedings 2928.

     Delegate Kinney, who initiated the amendment, was allowed to

clarify:

               "Yes, you are right, Mr. Lyons. That is what it is

          designed to do. Benefits not being diminished really

          refers to this situation: If a police officer accepted

          employment under a provision where he was entitled to

          retire at two-thirds of his salary after twenty years of

          service, that could not subsequently be changed to say he

          was entitled to only one-third of his salary after thirty

          years of service, or perhaps entitled to nothing. THAT IS

          THE THRUST OF THE WORD `DIMINISHED.' IT WAS NOT INTENDED

          TO REQUIRE 100 PERCENT FUNDING OR 50 PERCENT OR 30

          PERCENT FUNDING OR GET INTO ANY OF THOSE PROBLEMS, ASIDE

          FROM THE VERY SLIM AREA WHERE A COURT MIGHT JUDICIALLY

          DETERMINE THAT IMMINENT BANKRUPTCY WOULD REALLY BE

          IMPAIRMENT.

               ***

               *** It is simply to give them a basic protection

          against abolishing their rights completely or changing

          the terms of their rights after they have embarked upon

          the employment--to lessen them." (Emphasis added.) 4

          Proceedings 2629.

Later, Delegate Kinney stated:

          "All we are seeking to do is to guarantee that people

          will have the rights that were in force at the time they

          entered into the agreement to become an employee, and as

          Mr. Green has said, if the benefits are $100 a month in

          1971, they should be not less than $100 a month in 1990."

          4 Proceedings 2931-32.

     Delegate Green, also a sponsor of the amendment, discussed the

similarity of the proposed amendment to the New York provision.

Delegate Green noted, however, that unlike the New York provision,

the amendment was not intended to require funding directly.

Instead, the amendment was intended to force the funding of the

pensions indirectly, by putting the state and municipal governments

on notice that they are responsible for those benefits:

          "Our language is that language that is in the New York

          Constitution which was adopted in 1938, really under a

          similar circumstance. In 1938 you were about at the end

          of the Depression, but there was a great consideration on

          the part of the New York General Assembly to really cut

          out some of the money that they were giving to the

          pension programs in New York; and it was for this reason

          that the New York Constitution adopted the language that

          we are suggesting. Since that time, the state of New

          York--the pension funds for public employees have been

          fully funded, and so I think we have good reason to

          believe that this type of language will be a mandate to

          the General Assembly to do something which they have not

          previously done in some twenty-two years.

               NOW, WE ARE NOT IN ANY WAY SUGGESTING THAT THIS

          $2,500,000,000 THAT THEY ARE IN ARREARS BE BROUGHT UP TO

          DATE AT ANY ONE TIME. THE NEW YORK CONSTITUTION MANDATED

          THAT STATE TO FULLY FUND THE PROGRAM IN TWO YEARS. THIS

          WOULD BE A PHYSICAL IMPOSSIBILITY IN ILLINOIS.

               I do believe that if we could contact the actuary of

          the programs, it may well be in the scheduling, we could

          come up with a scheduling to do it. BUT IN LIEU OF A

          SCHEDULING PROVISION, I BELIEVE WE HAVE AT LEAST PUT THE

          GENERAL ASSEMBLY ON NOTICE THAT THESE MEMBERSHIPS ARE

          ENFORCEABLE CONTRACTS AND THAT THEY SHALL NOT BE

          DIMINISHED OR IMPAIRED." (Emphasis added.) 4 Proceedings

          2925.

     Vice President Lyons' fears were allayed by the comments of

Delegates Green and Kinney:

               "We now have heard from the proponents who have

          represented that that is the limit of the scope of this

          amendment. IT DOES NOT REFER TO UPFUNDING, NOR DOES IT

          SEEK TO ESTABLISH SOME SORT OF AN ADMINISTRATIVE ELITE TO

          ADMINISTER THESE VARIOUS FUNDS." (Emphasis added.) 4

          Proceedings 2929.

     Echoing Vice President Lyons, Delegate Whalen also reiterated

that the funding of the pension systems was outside the scope of

the amendment:

               "Mr. President and fellow delegates, I agree with

          Delegate Kinney, that as I read section 16, IT DOESN'T

          REQUIRE THE FUNDING OF ANY PENSIONS, AND THEREFORE THE

          WHOLE QUESTION OF FUNDING IS IRRELEVANT TO THE ISSUE OF

          WHETHER WE SHOULD ADOPT THE PROVISION." (Emphasis added.)

          4 Proceedings 2929.

     President Witwer expressly conditioned his vote on the

understanding that the amendment was not intended to control

funding:

               "I am voting yes in the hope that the points which

          Mr. Whalen has raised will be properly protected in the

          work of the Style and Drafting Committee and that there

          will be an affirmation that THIS DOES NOT DIRECT OR

          CONTROL FUNDING. I VOTE YES." (Emphasis added.) 4

          Proceedings 2932.

Thus, the framers of the Illinois Constitution set out only to put

state and municipal governments on notice that they may not abandon

their pension obligations on the belief that such payments were

gratuities. The clearly expressed intention of the framers was to

protect public pension benefits, but not to control funding.

     In People ex rel. Illinois Federation of Teachers v. Lindberg,

60 Ill. 2d 266 (1975), this court relied on these debates and

similarly concluded that section 5 of article XIII of the Illinois

Constitution of 1970 does not require any particular level of

funding. In Lindberg, participants in several teachers' pension

funds challenged then Governor Walker's item reduction of fiscal

appropriations made to their respective funds. The pension fund

participants argued that the Pension Code establishes and defines

a contractual relationship between themselves and the state which

obligates the state to fulfill its funding commitments. Lindberg,

60 Ill. 2d at 271-72. This court rejected that view, noting that

"the convention debates do not establish the intent to

constitutionally require a specific level of pension appropriations

during a fiscal period." Lindberg, 60 Ill. 2d at 272. This court

concluded that section 5 of article XIII does not create a

contractual basis for participants to expect a particular level of

funding, but only a contractual right "that they would receive the

money due them at the time of their retirement." Lindberg, 60 Ill.

2d at 271.

     It is with this understanding of the protection afforded by

section 5 of article XIII that this court has consistently

invalidated amendments to the Pension Code where the result is to

diminish benefits. See, e.g., Felt v. Board of Trustees of the

Judges Retirement System, 107 Ill. 2d 158 (1985) (finding

unconstitutional an amendment to Pension Code that changed the

salary base for determining pension benefits); Buddell v. Board of

Trustees, State University Retirement System, 118 Ill. 2d 99 (1987)

(finding unconstitutional an amendment to Pension Code that

eliminated a participant's right to purchase military service

credits to increase benefits at retirement). Similarly, the

appellate court has also invalidated amendments to the Pension Code

only where the result was to diminish benefits. See, e.g., Kraus v.

Board of Trustees of the Police Pension Fund, 72 Ill. App. 3d 833

(1979) (finding unconstitutional an amendment to Pension Code

reducing the benefits paid to a beneficiary who changes from

disability retirement to regular retirement); Schroeder v. Morton

Grove Police Pension Board, 219 Ill. App. 3d 697 (1991) (finding

unconstitutional an amendment to Pension Code that reduced pension

benefits based upon receipt of worker's compensation benefits).

     In finding that the amendment to section 3--127 violated

section 5 of article XIII, the trial court relied on the McDermott

case from New York and the opinion contained in the affidavit of

Arthur Tepfer, the professional actuary. We recognize that in the

past this court has relied upon the interpretations given by the

New York courts concerning their provision. Buddell, 118 Ill. 2d at

106-07; Felt, 107 Ill. 2d at 163. In those cases, this court was

faced with the issue of whether a particular change in the Pension

Code diminished the benefits owed a beneficiary, a matter treated

similarly by both constitutions. However, the framers of our

constitution acknowledged that the New York provision was broader

than the provision proposed in Illinois, expressly requiring full

funding in two years. 4 Proceedings 2925. The framers did not

include the funding provision that is contained in the New York

Constitution, but adopted the rest of the language with the

understanding that it protected only benefits. Delegate Kinney

stated:

          "But I would say that the New York Constitution

     adopted such a provision in 1938, and this amendment is

     substantially the same language as the New York

     Constitution presently has. THE THRUST OF IT IS THAT

     PEOPLE WHO DO ACCEPT EMPLOYMENT WILL NOT FIND AT A FUTURE

     TIME THAT THEY ARE NOT ENTITLED TO THE BENEFITS THEY

     THOUGHT THEY WERE WHEN THEY ACCEPTED THE EMPLOYMENT.

     (Emphasis added.) 4 Proceedings 2931.

The clearly expressed intentions of the framers of the Illinois

Constitution must control over any discordant interpretation from

a sister state. The framers of our constitution simply did not

intend that section 5 of article XIII control the manner in which

state and local governments fund their pension obligations. In

addition, although plaintiffs' expert may express his professional

opinion concerning the propriety of the changes in funding, he may

not interpret the Illinois Constitution.

     We therefore hold that the amendment to section 3--127 does

not violate section 5 of article XIII of the Illinois Constitution.

Section 5 of article XIII creates an enforceable contractual

relationship that protects only the right to receive benefits.

Plaintiffs do not contend that the amendment to section 3--127

diminished their right to receive pension benefits. In addition,

plaintiffs' complaint does not allege that the new funding method

will impair benefits by placing a fund on the verge of default or

imminent bankruptcy. See 4 Proceedings 2926 (comments of Delegate

Kinney) ("The word `impaired' is meant to imply and to intend that

if a pension fund would be on the verge of default or imminent

bankruptcy, a group action could be taken to show that these rights

should be preserved"). Accordingly, the circuit court erred as a

matter of law in granting plaintiffs' motion for summary judgment.

                                CONCLUSION

     For the reasons stated, we hold that the amendment to section

3--127 does not violate section 5 of article XIII of the Illinois

Constitution. Accordingly, the judgment of the circuit court of

Cook County is reversed and the cause is remanded to the circuit

court for further proceedings.

                                                     Reversed and remanded.