456 S.E.2d 167

Stanley W. BOOTH, William D. Totten, Charles R. Martin and Gordon L. Clark, individually, Petitioners,

v.

James L. SIMS, as the Executive Secretary of the State of West Virginia Consolidated Public Retirement Board, Loretta K. Elder, David A. Haney, David A. Wyant, Toney Lautar, Jr., James H. Morton, Elizabeth Poundstone, S.S. Satterfield, Janet F. Wilson, all as Members of the West Virginia Consolidated Public Retirement Board, Chuck Polan, as Chairman of the West Virginia Consolidated Public Retirement Board, Glen Gainer, III, as Vice Chairman of the West Virginia Consolidated Public Retirement Board, and Governor Gaston Caperton and State Treasurer Larrie Bailey, both as Ex Officio Members of the West Virginia Consolidated Public Retirement Board, Respondents.

No. 22464.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 12, 1994.

Decided Dec. 15, 1994.

Concurring and Dissenting Opinion of Justice Miller Dec. 20, 1994.

Filed As Modified March 24, 1995.

Mark A. Sorsaia, Turley, Sorsaia & Garvin, Winfield, for petitioners.

Robert M. Nunley, Sr. Asst. Atty. Gen., Charleston, for respondents.

NEELY, Chief Justice:

This mandamus proceeding presents the question whether certain 1994 amendments to our State's public safety pension plan impair the obligations of contract under art. III, § 4 of the West Virginia *Constitution.* We granted a rule to show cause to set the law in clear and unambiguous terms concerning the pension rights of thousands of West Virginia public employees who have given their lives to government service and now rely for their future health, welfare and security upon the promises made to them by their fellow citizens through the elected legislature. For the reasons given below, legitimate expectations of government servants cannot be confounded after those servants have partially performed their part of the bargain with the people, relied to their detriment, and foreclosed other career options. Accordingly, to the extent that we find the 1994 public safety amendments unconstitutional in this opinion, we award the petitioners a writ of mandamus.

## I.

### THE FACTS

For the past seventy-five years, the West Virginia Division of Public Safety ["Division"][1] has employed hundreds of state troopers. These troopers are charged with protecting the life, liberty and property of our citizens, and this Court takes judicial

---

1. Previously, the "Division of Public Safety" was known as the "Department of Public Safety," and the Division's members are popularly referred to as "state police" or "state troopers."

notice that law enforcement is a physically demanding and dangerous occupation. Rule 201, *W.Va.Rules of Evidence.*

In 1919, the Division began its mission with one hundred and twenty-five men who had uniforms adapted from the World War I infantryman uniform. Today, the Division employs over five hundred men and women who are charged with law enforcement duties in what remains a paramilitary organization.

The legislature established a pension plan for the Division's trooper members in 1935. The plan originally required all troopers to make contributions amounting to 4 percent of their salaries and it was provided that the Division would match these contributions with an equal 4 percent payment.[2]

By 1993, the pension system required all state troopers to pay 6 percent of their salaries into the retirement system, and the Division made matching contributions of 12 percent. *W.Va.Code* 15-2-26 [1990]. After meeting eligibility[3] for retirement, a state trooper could then expect to receive an annual pension equal to 5.5 percent of his or her cumulative lifetime earnings as a state trooper or $6,000, whichever was greater[4]. *W.Va. Code* 15-2-27(c)(1) and (2) [1988]. In other words, if a trooper had earned $500,000 in total salary payments as a trooper over twenty-five years of service, his or her pension would be $27,500 per year for the rest of his or her life. In addition, beginning in 1988, the legislature also allowed all eligible retired members who had reached age fifty-six and over to collect an additional 3.75 percent of their pension awards as an annual annuity adjustment. *W.Va.Code* 15-2-27a [1988].

Before the legislature amended the plan's benefits in 1988, concern had arisen concern-

---

2. Miscellaneous fees also funded the system.

3. *W.Va.Code* 15-2-27 [1994] governs eligibility for collection of a pension. The statute provides that:
 (a) The retirement board shall retire any member of the [division] of public safety when the member has both attained the age of fifty-five years and completed twenty-five years of service as a member of the [division], including military service credit granted under the provisions of section twenty-eight of this article.
 (b) The retirement board shall retire any member of the division of public safety who has lodged with the secretary of the consolidated public retirement board his or her voluntary petition in writing for retirement, and:
 (1) Has or shall have completed twenty-five years of service as a member of the division (including military service credit granted under the provisions of section twenty-eight of this article);
 (2) Has or shall have attained the age of fifty years and has or shall have completed twenty years of service as a member of the division (excluding military service credit granted under section twenty-eight of this article); or
 (3) Being under the age of fifty years has or shall have completed twenty years of service as a member of the division (excluding military service credit granted under section twenty-eight of this article).

4. Under *W.Va.Code* 15-2-27(2), if a member had served twenty years or longer but less than twenty-five years as a member of the Division and was retired before reaching age fifty, payment of the pension would not begin until the member reached fifty. Beginning in 1988, however, *W.Va.Code* 5-16-13(e), part of the West Virginia Public Employees Insurance Act, conceivably al-

lowed retiring troopers under the age of fifty to credit their accumulated annual and sick leave in order to satisfy the twenty-five year service requirement. This not only allowed troopers to increase their pensions, but also to draw them earlier. *W.Va.Code* 5-16-13(e) [1992] currently states that:

> In the alternative to the extension of insurance coverage through premium payment provided in the two preceding subsections, on and after the first day of July, one thousand nine hundred eighty-eight, the participating employee's accrued annual leave and sick leave may be applied, on the basis of two days retirement service credit for each one day of accrued annual and sick leave, toward an increase in the employee's retirement benefits with such days constituting additional credited service in computation of such benefits under any state retirement system. However, such credited service shall not be used in meeting initial eligibility for retirement criteria, but only as additional service credited in excess thereof.

On January 25, 1994, the Consolidated Public Retirement Board voted to allow a state trooper to use his accrued sick and annual days to receive his pension before age fifty, as well as to collect greater monthly benefits under Code 5-16-13(e). After this decision, the legislature enacted *W.Va.Code* 15-2-27(c)(2), which states that "[b]eginning on the fifteenth day of July one thousand nine hundred ninety-four, in no event may the provisions of [*W.Va.Code* 5-16-13] be applied in determining eligibility to retire with either immediate or deferred commencement of benefit."

The constitutionality of this enactment, as it involves existing contract rights of the petitioners, is reserved for our discussion in section V.

ing the future solvency of the Division's pension system. According to a 1987 actuarial study, the existing contributions into the system were not sufficient to meet future pension payments, and the periodic increases in benefits without the necessary additional contribution levels from the employees and the Division created an $11,400,000 fund deficit. Although the plan's contribution levels had remained at the 18 to 20 percent of salary during the 1970s and 1980s, the 1987 actuarial review suggested that the required contributions should have been between 25 and 30 percent of the existing salary level. By 1990, the unfunded liability of the fund totalled over 88 million dollars, and the actuarial report prepared for the Division estimated the pension fund would be in a deficit by 2005.

Following the retirement of twenty-four state troopers during the calendar year 1993 [5], the legislature responded to concerns about the fund's actuarial soundness and amended the pension plan in 1994.[6] The newly wrought changes at issue here: (1) increased the monthly payroll deduction from state troopers' salaries from 6 percent to 7.5 percent effective 1 July 1994 and raised these contributions to 9 percent effective 1 July 1995; (2) prohibited the state troopers' use of accumulated but unused annual and sick leave as credit toward years of service in determining eligibility for retirement benefits (effective 15 July 1994); and (3) reduced the public safety retirement annual annuity (cost of living) adjustment from an annual 3.75 percent to 2 percent (effective 15 September 1994). *W.Va.Code* 15–2–26, 15–2–27(c)(2) and 15–2–27a [1994].[7]

On the effective dates of the amendments, the petitioners were all state police officers under the age of fifty who had over twenty years' service with the Division.[8] Thus, although no law compels them to do so, the petitioners may retire now and collect their respective pensions on the date that each of them reaches the age of fifty.[9] *W.Va.Code* 15–2–27(c)(2) [1988 and 1994].

Rather than retire before 15 September 1994 in order to protect their rights to a greater annuity, however, the petitioners sought to enjoin the respondents' implementation of the amendments and filed a declaratory judgment action in the Circuit Court of Kanawha County on 7 July 1994. The petitioners challenged the constitutionality of the amendments under the contracts clauses of the State and federal *Constitutions*. Thereafter, petitioners brought this original mandamus action in this Court and on 16 September 1994, the circuit court dismissed the petitioners' declaratory judgment action.

In the mandamus proceeding now before this Court, the petitioners claim the pension amendments unconstitutionally impair the vested rights to which they were entitled before the new legislation. In reply, the respondents assert the petitioners have no vested rights and that the amendments are reasonable because they guarantee the fu-

---

**5.** According to the Consolidated Public Retirement Board's Annual Report for the year ending June 30, 1994, a total of fifty state troopers retired from the Division during fiscal year 1993–94. Thirty-six of these retirements occurred during the six-month period between January 1, 1994 and June 30, 1994.

**6.** The legislature also enacted a new retirement system known as The West Virginia State Police Retirement Act ["Act"], *W.Va.Code* 15–2A–1 to 15–2A–19, which is intended to cover all future troopers of the Division. The petitioners claim the Act could be interpreted to apply to "all" troopers in the system before the enactment, and, consequently, that this enactment would create a more severe reduction of benefits. For the reasons given below, however, we find the Act does not govern pension eligibility for any state trooper who was a member of the Division's pension fund before the amendments of 12 March 1994.

**7.** The 1994 legislature also amended certain provisions of the Division's pension plan that established new benefits for members. *See* n. 24, *infra*. Although not at issue here, these other provisions do influence our analysis of the constitutionality of the Amendments at issue, and, consequently, we reserve our discussion of them for section V.

**8.** The petitioners had also contributed into the Division's predecessor fund.

**9.** Alternatively, the petitioners contend they may also apply their respective accrued annual leave and sick leave time to allow their collection of a pension before age fifty. See the discussion in n. 4.

ture solvency of the public safety pension fund.

## II.

### THE CONSTITUTIONALITY OF PENSIONS

Although we have never doubted the constitutionality of pension plans, our past decisions have not elaborated on the reasons why pensions are legitimate debts of the State. However, given the current financial condition of the Division's fund, as well as the impact of our decision here on future legislation that may affect the fund itself, this Court must first address the circumstances under which pensions of any sort are constitutional if we are to provide a complete statement on our pension law here.

*W.Va. Const.,* art. X, § 4 provides "No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years." *See also, W.Va. Const.,* art. X, § 6 (prohibiting the State from granting credit to municipalities and from becoming an owner or stockholder in any company or association). Because debt today leads directly to cuts in services tomorrow, our constitutional provisions against state debt "are designed to prevent one generation of politicians from helping their friends whilst leaving the next generation of taxpayers to foot the bill." *Winkler v. School Building Authority,* 189 W.Va. 748, 769, 434 S.E.2d 420, 441 (1993) (Neely, J., concurring).

The *Winkler* decision explored the constitutionality of certain school revenue bonds that were to be liquidated from the general revenue of the state. Before approving the bonds, the legislature placed various disclaimers on the face of the bonds in order to escape the application of our *Constitution*'s prohibition against the creation of state debt. These disclaimers stated that the legislature was neither creating a debt of the State in violation of art. X, § 4, nor creating an obligation to appropriate money to liquidate the bonds. After analyzing our previous cases on the issue, as well as the reasons for our state's prohibition against state-created debt, this Court ultimately concluded the State could not shirk its responsibilities to fund the bonds once it had undertaken its initial financial commitment. 189 W.Va. at 763, 764, 434 S.E.2d at 435, 436. We, therefore, forbade the issuance of similar bonds in the future.

In *Winkler,* we did note, however, that in certain instances the State could issue bonds when the bond proceeds, themselves, were to be used to build projects such as toll bridges, or buildings that generated money to liquidate the bond obligation. 189 W.Va. at 756–758, 434 S.E.2d at 428–430 (discussing funding arrangements that do not violate our constitutional debt limitations). In these instances, a special fund derives from the service itself, and, for this reason, lenders, not taxpayers, are the only potential losers if the project does not generate the anticipated returns.

■ This Court concluded long ago that our pension systems do not involve the creation of an unconstitutional debt. *State ex rel. Board of Governors v. Sims,* 133 W.Va. 239, 244, 55 S.E.2d 505, 508 (1949). Although *Sims* did not discuss the rationale behind its reasoning on this issue[10], given our decision in *Winkler* it should now be clear that pension systems are constitutional for the same reasons that special revenue bonds are constitutional: The pledge for the pension fund derives from the actuarially sound contributions of the employees and the Division; that is, the fund is expected to generate its own money to meet its eventual

---

10. *Sims* arose from a mandamus action brought by the Board of Governors of West Virginia University to compel the state auditor to pay its teachers certain pensions as provided for by the Board. This Court denied the writ because we concluded the legislature never authorized the Board to create a separate retirement program for its faculty with revenue that was derived from public money. Because *Sims* concerned the issue of the Board's authority to create a pension program, the opinion did not require a thorough discussion of the constitutionality of pension plans.

obligations. Because money is expected to be put away as a condition precedent to fund the system, pensions are legitimate debts of the state. Consequently, *W.Va. Const.* art. VI, § 51B(3)(d) requires the Governor to prepare a yearly budget that allows for payment of pensions as constitutionally created debt of the State.[11]

Until the passage of the amendments at issue in this case, the legislature had not sufficiently increased the contributions of the troopers and the Division to meet the State's eventual pension debt, and according to a 1994 actuarial study, the unfunded accrued liability for the troopers' retirement system now totals $166,668,239. This is not the first time that this has happened. In *Dadisman v. Moore*, 181 W.Va. 779, 384 S.E.2d 816 (1989), this Court confronted the financial problems of the Public Employees Retirement System ["PERS"], which, because of underfunding from the legislature, had in-

curred unfunded liabilities totaling between $55 and $80 million.

*Dadisman* arose from an original mandamus proceeding brought by a retired public employee against various executive and legislative officials charged with administering PERS. We found the PERS officials had breached their contractual, statutory and trust duties to petitioner by failing to appropriate sufficient money to maintain the actuarial soundness of PERS and we granted a writ requiring proper funding of the system.

In an effort to maintain the actuarial soundness of the Division's pension system here, the legislature enacted the amendments to require greater contributions from the employees and the employer. Thus, in addressing the mandamus action now before us, we must consider whether the actuarial amendments, themselves, are constitutional measures designed to insure the fund's solvency.

---

11. *W.Va. Const.* art. VI, § 51 controls our State's budget procedures. Under Subsection B, part 3 of the section, "[e]ach budget shall embrace an itemized estimate of the appropriations, in such form and detail as the governor shall determine or as may be prescribed by law: (a) For the legislature as certified to the governor in the manner hereinafter provided; (b) for the executive department; (c) for the judiciary department, as provided by law, certified to the governor by the auditor; *(d) for payment and discharge of the principal and interest of any debt of the State created in conformity with the Constitution, and all laws enacted in pursuance thereof;* (e) for the salaries payable by the State under the Constitution and laws of the State; (f) for such other purposes as are set forth in the Constitution and in laws made in pursuance thereof." [Emphasis added].

The budget section of the State's finance division acts as staff agency for the Governor in the exercise of his powers and duties under *W.Va. Const.* art. VI, § 51. *See, W.Va.Code* 5A-2-1 [1991]. According to *W.Va.Code* § 5A-2-12(5) [1990]:

Within fifteen days after the end of each month of the fiscal year, *the head of every spending unit shall certify to the legislative auditor the status of obligations and payments of the spending unit for amounts of employee benefits, including, but not limited to, obligations and payments for social security withholding and employer matching, public employees insurance premiums and public employees retirement and teachers retirement systems.* [Emphasis added].

When a spending officer submits an expenditure schedule to the secretary as required by

this section, the spending officer shall at the same time transmit a copy thereof to the legislative auditor and the joint committee on government and finance or its designee. If a spending officer of a spending unit fails to transmit such copy to the legislative auditor on or before the beginning of the fiscal year, the legislative auditor shall notify the secretary, auditor and treasurer of such failure, and thereafter no funds appropriated to such spending unit shall be encumbered or expended until the spending officer thereof has transmitted such copy to the legislative auditor.

In the event the legislative auditor determines from certified reports or from other sources that any spending unit is not making all payments and transfers for employee benefits from funds appropriated for that purpose, the legislative auditor shall notify the secretary of the administration, auditor and treasurer of such determination and thereafter no funds appropriated to such spending unit shall be encumbered or expended for the salary or compensation to the head of the spending unit until the legislative auditor shall determine that such payments or transfers are being made on a timely basis.

In 1991, the legislature enacted "The Debt Management Act," *W.Va.Code* 12-6A-1 to 12-6A-7 ["DMA"], which currently supplements the State's creation of the finance division in *W.Va. Code* § 5A-2-1 *et seq..* The DMA requires the director of the state Board of Investments to act as a liaison with the legislature on all debt matters, including, but not limited to debt issued by the state and its spending units.

## III.

### PAST CASES NEEDING CLARIFICATION

This Court has never expressly determined whether an employee, who otherwise satisfies the requirements for a pension but is still in active state service, may lose entitlements before he or she formally applies for retirement benefits. Instead, having often considered the issue of pension vesting in the context of retired employees who did not meet eligibility for pensions, we have decided some difficult cases that made incomplete law in this area.

We announced when a police officer may collect a pension under our law in *State ex rel. Fox v. Board of Trustees of Policemen's Pension,* 148 W.Va. 369, 135 S.E.2d 262 (1964):

> The right to a pension for a member of a municipal fire department or police department is based upon and created by ... statute [*W.Va.Code* 8–6–20 (1959)] and such right accrues or vests in such member only when all the statutory conditions are performed and all its requirements are complied with and satisfied. It is then and only then that a vested right to such pension accrues.

148 W.Va. at 373, 135 S.E.2d at 264 (citing *State ex rel. Frye v. Bachrach,* 175 Ohio State 419, 195 N.E.2d 803 (1964)).

*Fox* concerned a police officer's right to a pension after his service ended with the City of Bluefield. When the officer resigned, he had continuously served over twenty-five years with the city, but he had not yet attained the age of fifty. After he reached fifty, however, the officer immediately applied for a pension, and the pension board denied his application. On appeal, we affirmed the board's denial of benefits.

The result in *Fox* rested on our interpretation of *W.Va.Code* 8–6–20 [1959], which formerly governed an officer's eligibility for a pension. Given the language of that statute, we found it allowed "a pension only for a member of a municipal fire department or police department who [had] been in the service of such department for twenty years *and who [was] a member of such department when he [reached] the age of fifty years.*" 148 W.Va. at 373, 135 S.E.2d at 265 [Emphasis added]. Because the officer resigned from service before he became fifty, he did not meet the requirements of the statute, and, consequently, he had no vested right in a pension. 148 W.Va. at 375, 135 S.E.2d at 266. In addition, Officer Fox had pled guilty to twenty-four felonies he committed while he was a policeman, and we held the pension statute also implicitly required honorable service to entitle an employee to retirement benefits. Syl.Pt. 3, *Fox.*

In 1976, the legislature codified *Fox*'s common law requirement of honorable service for receipt of pension benefits at *W.Va.Code* 5–10A–1 to 5–10A–10. We were eventually asked to decide the constitutionality of these enactments as they affected the rights of a long-term public employee who had been convicted of a felony for actions taken while Sheriff of Marion County in *West Virginia Public Employees Retirement System v. Dodd,* 183 W.Va. 544, 396 S.E.2d 725 (1990). Unlike Officer Fox, Sheriff Dodd had contributed [12] to the pension system for over twenty-five years at the time the legislature made the above enactments, and he did not commit his felony until his thirtieth year of employment. Nevertheless, upon the sheriff's application for retirement benefits, the board denied his pension.

The sheriff argued he should receive at least a prorated portion of his pension for the services he rendered until he violated the law. He also asserted the 1976 enactments unconstitutionally impaired his pension rights under his employment contract. This Court, however, found the enactments did not impair the sheriff's contract because the implicit condition of honorable service at all times was never satisfied and, therefore, his contract rights to the pension never fully vested. 183 W.Va. at 550, 396 S.E.2d at 732. Given his misconduct, we held the sheriff had forfeited his entire pension.

---

**12.** Technically, Sheriff Dodd had received thirteen years of prior, noncontributing service credit under PERS for his participation before the implementation of the system in 1961.

Both *Fox* and *Dodd* explored the issue of pension vesting in the context of employees who did not meet eligibility for benefits. However, *Wagoner v. Gainer,* 167 W.Va. 139, 279 S.E.2d 636 (1981), examined pension vesting as it applied to employees who *were* eligible and *were* receiving benefits.

In *Wagoner,* the legislature had passed amendments that reduced the pension benefits of retired supreme court justices and circuit court judges. Before the enactment of the amendments at issue in *Wagoner,* all eligible retired justices and judges could collect retirement benefits equal to 75 percent of the salary of their highest judicial office and their pensions went up as raises were given to active justices and judges. But, in 1979, the legislature repealed this "escalator provision," and the aggrieved retired judges challenged the legislation as an unconstitutional impairment of contract under the state and federal *Constitutions.* After the circuit court granted the judges a writ of mandamus allowing them payments under the earlier "escalator provision," the state auditor and treasurer appealed.

In *Wagoner,* the parties did not dispute that the appellees could receive a pension; instead, the dispute centered in the extent of the changes that the legislature could make to the retired pensioners' plans. This Court discussed how other jurisdictions treated pension rights, and after a lengthy examination of the subject, we concluded:

> Legislative modifications to a pension plan must be reasonable, and the test for reasonableness is whether the alteration to the pension scheme serves to keep the system sound and flexible [citations omitted.] *Thus, beside the fact that the rights of retired plan members cannot be detrimentally altered at all, alterations to keep the trust fund stable should first be directed at threats to the trust fund's solvency.*

167 W.Va. at 154, 279 S.E.2d at 645. [Emphasis added].

By removing the "escalator provisions," the legislature plainly subtracted benefits to which the appellees had a contract right.

Consequently, we found the legislation impaired the obligations of contract. 167 W.Va. at 154, 279 S.E.2d at 646.

Until our decision in *Dodd, Wagoner* seemingly controlled our analysis of public employees' pension rights. In fact, before we issued the *Dodd* opinion, we held in *Dadisman, supra,* that "retired and *active* PERS plan participants have contractually vested property rights created by the pension statute, and such property rights are enforceable and cannot be impaired or diminished by the State." Syl. Pt. 16, *Dadisman* [Emphasis added].

As noted earlier, *Dadisman, supra,* found the executive and legislative branches had failed to make the PERS fund actuarially sound over the course of many years. In analyzing the PERS trustees' duties to members of the fund, we concluded that the PERS trustees' failure to fund the pension system improperly impaired the state's obligations of contract to the participating plan members.

The petitioners suggest *Dadisman* (and *Wagoner* ) establish contractually vested property interests for *all* participants in a contributory pension program. Unfortunately, the petitioners' argument does not reflect our previous holdings on this issue because, as our discussion below will reveal, our cases have unnecessarily merged pension eligibility with pension vesting. Our most recent pronouncement on pension vesting, *Mullett v. City of Huntington Police Pension Board,* 186 W.Va. 488, 413 S.E.2d 143 (1991), serves as an example.

*Mullett* is deceptively similar to the case now before us because it considered whether the legislature could amend an active [13] employee's pension plan without unconstitutionally impairing the obligations of contract. Officer Mullett began his employment with the Huntington Police Department on 23 April 1968 and remained a full-time employee until his retirement in April 1991. During this period, to qualify for pension benefits, an officer needed at least twenty years' service

---

**13.** Although retired by the time of his appeal, Officer Mullett was active at the time of the

amendments affecting his pension plan.

under former *W.Va.Code* 8–6–20 [1967] ("1968 statute").[14] On the date of Officer Mullett's hire, the 1968 statute also conceivably allowed an officer with at least one day of military service to apply for an early pension.[15] In 1985, however, the legislature amended the 1968 statute to limit the military service provision by requiring a "one year or more" interruption of employment before an officer could apply for an early pension. *W.Va.Code* 8–22–25(c) and 8–22–27 [1985].

In July 1977, Officer Mullett enlisted in the National Guard, and his enlistment entailed various weekend drills and summer camps until he retired from the police department. Although he admitted his National Guard service did not interrupt his police duties for a continuous year, Officer Mullett believed his guard duty allowed him an early pension when he applied for one in 1990.

The pension board twice denied Officer Mullett's application for an early pension.[16] The circuit court, however, granted Officer Mullett his early pension because it believed the *Wagoner* case compelled the application of the 1968 statute in effect at the time of the officer's hire.

On appeal by the pension board, we discussed whether the officer could apply the provisions of the 1968 statute that allegedly entitled him to an early pension. After considering the facts, we decided he could not and held the 1985 legislation applied to his case because there was not *"any vesting of rights on [Officer Mullett's] behalf in 1985, the ... year [that the legislature made the amendments ]."* 186 W.Va. at 493, 413 S.E.2d at 148.[17] [Emphasis added]. We noted:

Until such time as Mr. Mullett was entitled pursuant to the applicable statute *to apply* for pension benefits, his rights were clearly not vested. [Emphasis added].

186 W.Va. at 494, 413 S.E.2d at 149 (citing, *Fox*, 148 W.Va. at 373, 135 S.E.2d at 264; accord *Wagoner*, 167 W.Va. at 146, 279 S.E.2d at 641 ["in a contributory pension plan, the pensioners' rights vest when all the conditions entitling them thereto have been fulfilled."])

Although the respondents agree that the petitioners may apply for pensions now, which they may collect when they reach age fifty, they argue our holding in *Mullett* limits vesting to *retired*—and not active—plan members. In support of this contention, they direct us to Syllabus points 2 and 3 of *Mullett*, where we stated:

When a municipal police officer retires and ceases to be a contributing member to a pension plan, his rights pursuant to such plan are vested and the pension contract becomes fully executed rather than executory.

During the time period when a pension contract is merely executory with respect to a particular individual due to the fact that he/she is still an active, participating member, the Legislature may amend the plan provided that any amendments survive a test of reasonableness.

The respondents claim this above language clearly precludes any vested pension interest of the petitioners. We now, upon careful reflection, disagree.

We must concede here that *Mullett* was one of those cases where a hard case made, at least, incomplete law. Officer Mullett was arguing for an utterly absurd result, namely that by reason of his weekend warrior status

---

**14.** Although *Mullett* gives 1968 as the date of the statute at issue, the legislative history actually reveals that at the time of the officer's hire, the statute had last been amended in 1967. However, to be consistent, we will refer to the statute as the "1968 statute."

**15.** The officer argued the 1968 statute required only a one day interruption for military service. Although this Court did not need to resolve the issue, we expressed doubt about this contention. *Mullett*, 186 W.Va. at 494, 413 S.E.2d at 149 n. 8.

**16.** For the sake of both brevity and clarity, we have not detailed *Mullett*'s exact procedural history.

**17.** At the time of the 1985 amendments, Mr. Mullett had completed only 17 years of service. The retirement statute then in effect required at least twenty years' service before an officer became eligible to apply for a pension. *See W.Va. Code* 8–6–20 [1968].

he was entitled to the same military benefits as a person who had served a standard tour of duty in a regular, full-time armed force. Obviously, the legislature never intended such a result and in *Mullett* we simply found it more convenient to repair to the language of *Fox* to decide the case than to discuss legislative intent in the face of inartful draftsmanship. Now, however, we are squarely confronted with a case where: (1) state employees (2) accepted employment with West Virginia (3) under a compensation plan where a substantial part of their entire compensation was to be deferred and paid through a pension (4) the conditions for the vesting of which were clear and unambiguous and (5) (unlike *Mullett*) there was no inartful draftsmanship leading to a wholly irrational result so beyond any reasonable expectation that it amounted to a clerical error. Consequently, to the extent that anything in *Mullett* or *Fox* (which was also a hard case on the facts, given Officer Fox's felony convictions) is inconsistent with this case, both *Mullett* and *Fox* are overruled.

## IV.

### OUR HOLDING TODAY

When considering the constitutionality of legislative amendments to pension plans, an employee's eligibility for a pension does not determine whether he or she has vested contract rights. Instead, the determination of an employee's vested contract rights concerns whether the employee has sufficient years of service in the system that he or she can be considered to have relied substantially to his or her detriment on the existing pension benefits and contribution schedules. We must, however, stress that our holding here does *not* alter the applicable statutes controlling a state employee's eligibility for a pension, itself. Until a public employee meets the relevant age and service requirements for collection of a pension, he or she may *not* receive a pension, and nothing in this opinion alters the existing procedure for reimbursing pension contributions into the plan upon a public employee's voluntary or involuntary separation from state employment. What we are concerned with today is not the technical concept of "vesting," but rather the conditions under which public employees have a property right not to have their pension system detrimentally altered that is protected under the contract clauses because of substantial detrimental reliance on the existing pension system.

In pension cases, then, there are two distinct issues of contract: (1) an employee's contract right to collect a pension after statutory eligibility requirements have been met; and (2) the employee's legitimate expectations, also contractual in nature, that the government will not detrimentally alter the pension scheme once the employee has spent sufficient time in the system to have substantially relied to his or her detriment. The first issue involves whether the employee has remained in government service for such a length of time that he or she can collect benefits; the second issue involves the employee's reliance on promised government benefits after years of government service but before actual retirement age. Pension eligibility and reasonable expectations about the system's continued benefits are entirely separate issues.

By meeting certain eligibility requirements, a public employee acquires a *right* to payment under a pension plan. For any employee not yet eligible for payment, this is a mere expectancy; if the public employee does not meet the age and service requirements for benefits, his or her participation in a state pension plan does not allow receipt of a pension. But this same participation *does* create an employee's reliance interest in pension benefits. Consequently, an employee's membership in a pension system and his or her forbearance in seeking other employment prevents the legislature from impairing the obligations of the pension contract once the employee has performed a substantial part of his or her end of the bargain and has substantially relied to his or her detriment.

Although participation in a government pension system and forbearance in seeking other employment create an employee's contract right to pension benefits under art. III, § 4 of our *Constitution*, such participation does *not* create contract rights to

government employment. We must make clear, therefore, that entitlement to continued government *employment* continues to be controlled by civil service statutes, applicable regulations, the due process and equal protection clauses, the first amendment and other employment-related law. *See, Adkins v. Miller*, 187 W.Va. 774, 421 S.E.2d 682 (1992); *Snyder v. Civil Serv. Commission*, 160 W.Va. 762, 238 S.E.2d 842 (1977); *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

■ If an employee engages in misconduct during his or her public service, he or she may nevertheless forfeit rights to collect a pension later. Thus, insofar as *Dodd* holds that an employee's misconduct results in a forfeiture of the entire pension, it is still good law because the requirement of honorable service (at least since 1976) has been established in advance and has been made an explicit part of the entire bargain. Otherwise, if misconduct is not at issue, *Dodd* (and all other similar cases) no longer state the law when we consider legislative amendments to a government pension plan; thus, to the extent that *Dodd* and other cases are inconsistent with this opinion, *they are overruled.*

Other jurisdictions have reached similar results when considering the constitutionality of amendments to pension plans because the judges in these jurisdictions also conclude the deferred compensation embodied in a pension entitlement creates a reliance interest in the state employee that the law of contracts protects. *See, Halpin v. Nebraska State Patrolmen's Retirement System*, 211 Neb. 892, 897–898, 320 N.W.2d 910, 913–914 (1982) (citing cases); *Singer v. Topeka*, 227 Kan. 356, 607 P.2d 467 (1980).[18] Although we agree with the holdings of these cases, we must elaborate on the reasons for *our* rules to avoid possible misunderstanding.

Law enforcement is dangerous. Injuries and loss of life are inherent in the occupation. In order to protect the public as well as themselves, therefore, law enforcement officers must necessarily have certain characteristics. They must be agile, strong, flexible, resilient and have great stamina—all qualities associated with youth. Because the State understands this, the State seeks to recruit young persons for employment as state troopers. Until 1994, *W.Va.Code* 15–2–7(c) [1985] provided, in part, that "[e]ach applicant for appointment shall be a person not less than twenty-one nor more than thirty years of age, of sound constitution and good moral character; shall be required to pass such mental examination and meet other requirements as may be provided for in regulations promulgated by the cadet selection board; and shall be required to pass such physical examination as may be provided for in regulations promulgated by the retirement board: ..."[19]

■ When the legislature structures the state troopers' pension system to allow for retirement before age fifty, the legislature encourages suitable candidates to forego other employment opportunities today for real pension benefits tomorrow.[20] In practical

18. This Court acknowledges that contrary authority exists on this issue. *See*, Annot., Vested Right of Pensioner to Pension, 52 A.L.R.2d 437. Moreover, although most jurisdictions have adopted contract approaches when considering amendments to public employee pensions, they do not always agree on the time *when* a public employee acquires contract property rights in a pension. *See*, 60A Am.Jur.2d, *Pensions and Retirement Funds*, § 1620 (discussing when public employees' rights in a pension "vest"). We think any further discussion of these concerns unnecessarily confuses our decision here, and, for this reason, we choose not to discuss the other approaches to public employee pension rights because this Court rejects them in their entirety.

19. *W.Va.Code* 15–2–7(c) formerly allowed modification of its age limit requirement for persons over the age of thirty with active duty military experience who were applying for positions as helicopter pilots in the Division. In 1994, the legislature eliminated this language and *W.Va. Code* 15–2–7(c) now requires only a minimum age of twenty-one to become a state trooper.

20. In a 1964 article "The New Property," Professor Charles A. Reich postulated that the wealth of more and more Americans depends upon a relationship to government. Reich, "The New Property," 73 *Yale L.Rev.* 733 (1964). Although the ownership of property in earlier times was thought to confer power on a person, the government now assumes such power over the regulation of property that it, in essence, controls wealth. As Professor Reich wrote:

terms, the State's promise results in the recruitment of many state troopers, who, although they may not attain the rank of Captain [21], may nevertheless complete twenty years' service and receive substantial retirement payments. The State's employment system for state troopers, then, not only results in a smooth recruitment of troopers, but also resembles the compensation system of the armed forces of the United States. Employees join the ranks early, complete their service during their most productive years, and then leave the system. By providing pensions, the State clearly entices troopers to remain in the government's employ, and it is the enticement that is at the heart of employees' constitutionally protected contract right after substantial reliance not to have their own pension plan detrimentally altered.

 If the State (or its political subdivisions) promise to defer salary benefits until a person's retirement from State (or local) employment, and then promises to pay those deferred salary benefits in the form of a pension, the State (or its political subdivisions) cannot eliminate this expectancy without just compensation once an employee has substantially relied to his or her detriment.

To permit otherwise would be tantamount to allowing the State (or its subdivisions) to steal a car an employee might have purchased had he or she not been required to allow part of the wage fund to be diverted to pension funding. The difference between a pension and the car lies only in whether the employee may enjoy the benefit today or must wait until tomorrow. Thus, when a public employee has devoted substantial service to the state that translates into substantial detrimental reliance, the State must provide just compensation for any pension expectancy it eliminates.

Today's decision may, at first blush, appear harsh on legislatures and executives who are required to administer public employee pension funds and pay their benefits. The problem, however, is that both legislatures and executives in the past made then current promises to be fulfilled in the future by other legislatures and executives. It is a recurrent problem of government that today's elected officials curry favor with constituents by promising benefits that must be delivered by tomorrow's elected officials.

 Unfortunately, the state troopers, secretaries, school service personnel,

*[T]oday more and more of our wealth takes the form of rights or status than of tangible goods. An individual's profession or occupation is a prime example. To many others, a job with a particular employer is the principal form of wealth. A profession or a job is frequently far more valuable than a house or bank account, for a new house can be bought, and a new bank account created, once a profession or job is secure. For the jobless, their status as governmentally assisted or insured persons may be the main source of subsistence.... To the individual, these new forms, such as a profession, job or right to receive income, are the basis of his various statuses in society, and may therefore be the most meaningful and distinctive wealth he possesses.*

. . . . .

*No form of government largess is more personal or individual than an old age pension. No form is more clearly earned by the recipient, who, together with his employer, contributes to the Social Security fund during the years of his employment. No form is more obviously a compulsory substitute for private property; the tax on the wage earner and employer might readily have gone to higher pay and higher*

*private savings instead. No form is more relied on, and more often thought of as property....* 73 *Yale L. Rev.* at 738–739, 769 [Emphasis added]. *See also,* Joseph William Singer, "The Reliance Interest in Property," 40 *Stanford L.Rev.* 611 (1988).

**21.** Under *W.Va.Code* 15–2–5 [1994], a state trooper who completes a certain amount of service with the Division is entitled to receive reclassification up to the rank of Corporal without the requirement of a promotion. The longevity requirements are as follows: Trooper—less than three years; Senior Trooper—three years to eight years; Trooper First Class—nine years to fourteen years; Corporal—more than fourteen years. No officer, however, may progress to a rank higher than Corporal under the reclassification system, and any other promotion of an officer must result by appointment of the superintendent. *W.Va.Code* 15–2–4.

Currently, a third-year Trooper earns $22,308 per year, a Corporal earns $27,960 and the highest rank of career troopers Lieutenant Colonel earns $42,360. The rank of Colonel earns $60,000 and is reserved for the commanding officer who is appointed by the Governor. *See, W.Va.* 15–2–2 [1991].

teachers, highway workers, maintenance employees, assistant prosecuting attorneys and other ordinary state and local workers are not sophisticated politicians who expect their government to lie to them. When, therefore, today's legislature and today's governor make those workers promises, those workers believe the promises and organize their lives in the expectation that their government and their employer will treat them honorably. In these circumstances, the rules cannot be changed after employees have substantially relied to their detriment. The cynosure, then, of an employee's *W.Va. Const.* art. III, § 4 contract right to a pension is not the employee's or even the government's contribution to the fund; rather, it is the government's *promise to pay*. Heretofore, in *Dadisman, supra,* we have emphasized the legislature's obligation to fund pension systems on a sound actuarial basis. We are not administrators, however, and we can only articulate what the law is. It is for the governor and the legislature to enforce the law.

 Because pensions are a lawful debt of the State, the proper remedy for any failure to pay a pension is a mandamus action against the state treasurer and auditor. Although the actuarial funding of the pension program may be an interesting issue for lawyers, it means nothing to lay persons who work for this State as troopers, secretaries and janitors and whose expertise is not in the law. Upon attaining eligibility, workers expect to collect their pensions, and their contracts do not condition these benefits upon actuarial soundness of the system. Consequently, the funding of any pension program is the legislature's problem—not the state employees'—and once the legislature establishes a pension program, it must find a way to pay the pensions, at least to those persons who have substantially relied.

 Of course, this is not to say that changes may not be made in pension systems with regard to *new employees* who have not yet joined the system and who have *not* yet relied to their detriment. Changes can be made with regard to employees with so few years of service that they cannot be said to have substantially relied to their detriment. Line drawing in this latter regard must be made on a case-by-case basis, but after ten years of state service detrimental reliance is presumed. Thus, our constitutional provision against the State's impairment of obligations of contract, *W.Va. Const.* art. III, § 4, means only that the government must keep its promises; art. III, § 4 *does not* mean or even imply that the government must make promises in the first place. Furthermore, to the extent that the government wishes to apportion *future* wage increases between immediate cash payments to existing workers and improved funding of pension systems, it may do so: No state or local employee has a right to a wage *increase,* and (as in the case before us) the State may ask workers to help make pension funds solvent by contributing to the funds *new* money given to them by the State for this purpose.[22]

As we noted earlier, under *Wagoner,* the legislature cannot "detrimentally alter" rights of vested retirees. However, in *Mullett,* we stated the *Wagoner* rule "does not automatically apply to amendments [that] affect the rights of non-retired employees." 186 W.Va. at 494, 413 S.E.2d at 149. If an active employee did not qualify for a pension

---

**22.** For example, under *W.Va.Code* 51-2-13 [1994], the legislature recently raised the salaries of circuit court judges from $65,000 to $80,000 effective 1 January 1995; at the same time, the legislature also increased the judges' required contributions to the pension fund from 6 percent to 9 percent under *W.Va.Code* 51-9-4(a) [1994]. Although the legislature increased the judges' required contributions to the pension plan by 3 percent, the legislature nevertheless gave the judges more than enough money to meet the extra contribution. Before the amendment, each judge paid about $3,900 (6 percent of $65,000) to the pension fund; after 1 January 1995, each judge must pay about $7,200 (9 percent of $80,-000) to the pension fund; however, the $15,000 *new* money given to the judges offsets the extra $3,300 burden and actually results in over an $11,000 gain to the judges.

By its own terms, *W.Va.Code* 51-9-4(b) [1994], in fact, reveals that the legislature followed the rule we have now explained. The section reads: "[t]he Legislature finds that any increase in salary for judges of courts of record directly affects the actuarial soundness of the retirement system for judges of courts of record and, therefore, an increase in the required percentage contributions of members of that retirement system is the same subject for the purposes of determining the single object of this bill."

when the legislature amended the plan, we formerly applied the "California rule":

> An employee's vested [sic] contractual pension rights may be modified prior to retirement for the purpose of keeping a pension flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system. . . . Such modifications must be reasonable, and it is for the courts to determine upon the facts of each case what constitutes a permissible change. To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantages to employees should be accompanied by comparable new advantages.

186 W.Va. at 495, 413 S.E.2d at 150. [Citations omitted].

■■■■ According to *Mullett*, "the key concern raised by both *Wagoner* and the "California rule" . . . is disadvantage or detriment to the active members as a *group* rather than on an individual basis." 186 W.Va. at 495, 413 S.E.2d at 150. Because *all* employees who contribute to a state pension fund and who rely substantially to their detriment on a specific contribution and benefits schedule have immediate legitimate expectations that rise to the level of constitutionally protected contract property rights, we overrule *Mullett*'s test of reasonableness for determining the constitutionality of legislative amendments to a pension system. By allowing the legislature to diminish pension benefits, the *Mullett* test frustrates the employees' reliance on the anticipated pensions that they legitimately expect to receive upon qualifying through years of service and age for benefits. We therefore find the *Wagoner* rule applies to the case here and we hold that the pension rights of *all* current plan members who have substantially relied cannot be detrimentally altered at all, and that any

alterations to keep the trust fund solvent must be directed to the infusion of additional money. *See,* Syl.Pt. 3, *Wagoner* ("While the Legislature has the right to make reasonable alterations to the judicial pension fund, such alterations cannot impair the benefit level where there are extant statutorily-created inequities and special unfunded benefit provisions that affect the equal application of the law or the financial integrity or cost of the pension fund.")

■■■■ "Detrimentally alter" means the legislature cannot reduce the existing benefits (including such things as medical coverage) of the pension plan or raise the contribution level without giving the employee sufficient money to pay the higher contributions.[23] Should the legislature seek to reduce certain advantages of a pension plan, it must offer other equal benefits in their place as just compensation. Thus, until an employee becomes eligible to draw a pension, his or her benefits can be determined on an actuarial basis, and until such time as the employee's reliance is so strong as effectively to preclude all other options, the State may buy out the employee's contract property rights. At some point, however, the worker has chosen to remain in public employment for such a substantial part of his or her life that the State can no longer purchase the employee's pension without the acquiescence of the employee. At what point in an employee's career it is no longer equitable for the State to buy back the employee's contract rights on a sound actuarial basis without confounding the principles forbidding the impairment of contracts can be decided only on a case-by-case basis by the legislature and the courts. Of course, the legislature may always augment pension property rights. But the legislature cannot reduce a participating employee's pension property rights once it establishes the system unless the employee acquiesces in the changes to the pension plan or unless the employee has so

---

**23.** This does not mean that the legislature cannot modify medical benefits for *working* State employees since medical technology and the cost of medical care are constantly changing. However, if the state promises or implies to employees that at retirement they will receive the same medical benefits as active State employees at modest or no cost, then the State may not thereafter raise the cost of medical coverage disproportionately to cost raises applicable to working State employees or change the benefits in any way that does not apply as well to working State employees.

342

few years in the system that he or she has 'not detrimentally relied on promised pension benefits.

## V.

## THE AMENDMENTS AT ISSUE

Turning to the case before us of the state troopers, we hold the petitioners clearly have property rights that cannot be withdrawn under the rules that we have explained because the petitioners are all state employees who have contributed into the fund and substantially relied to their detriment in investing more than half of their working lives with the State. When considering the constitutionality of the amendments under *Wagoner*'s test as we have refined it here, therefore, we must determine whether the petitioners are offered any new advantages of equal or greater value to the plan's old benefits.

The initial amendment requires all state troopers to increase their contributions to 9 percent of their pay by 1 July 1995 without any corollary increase in the retirement award itself.[24] According to the respondents, the increased employee contributions are constitutional because (1) the Division must make greater contributions into the fund and (2) the legislature enacted other changes[25] benefitting the state troopers, one of which

included a $1,008 pay raise given to all state employees. Because our inquiry into the constitutionality of the amendments concerns the *benefits* that petitioners receive under the plan, how much the Division contributes to the fund cannot influence our analysis here. For this reason, we do not accept respondents' first argument. We do, however, find the legislature's other 1994 changes offer state troopers advantages of equal or greater value than the ones they expected under the former plan. Consequently, we find the initial amendment constitutional.

The legislature may increase a public employee's salary contribution to a pension plan if it gives a corresponding raise in salary or other benefits that offsets the employee's increased contribution to the system. To be constitutional under art. III, § 4, the additional salary or other benefits must at least cover the public employee's extra contribution to the system. Here, the petitioners are required to contribute an additional 3 percent of their salaries by 1 July 1995; however, the petitioners have also received a $1,008 raise in salary, as well as other benefits that we discussed in footnote 24. Therefore, we find the petitioners have been extended benefits that offset their increased contribution to the pension plan.[26].

24. Under this Amendment, the Division must also increase its contributions according to the following schedule: thirteen percent by 1 July 1995, fourteen percent by 1 July 1996 and fifteen percent by 1 July 1997. The fund usually generates about 3 percent additional revenue from miscellaneous payments.

25. In particular, the 1994 Legislature amended *W.Va.Code* 15–2–37 [1977] and 15–2–27a [1988]. *W.Va.Code* 15–2–37 formerly provided, in part, that "[a]ny member who shall be discharged by order of the superintendent after such member has or shall have served two full years or more as a member of [the Division] shall, at the request of such member, be entitled to receive from said fund a sum equal to the aggregate of the principal amount of moneys deducted from the salary of such member and paid into said death, disability and retirement fund …" In other words, after two years, if a trooper were discharged, he or she could demand the return of all his or her pension contributions into the fund. However, *W.Va.Code* 15–2–37(a) [1994] now allows troopers leaving the Division after two years to receive 4 percent interest on all their previous contribu-

tions into the fund. *W.Va.Code* 15–2–37(c) [1994] also allows troopers who have completed ten years' service or more and who terminate their employment either to withdraw their contributions to the fund with interest *or* receive a deferred annuity when they reach age sixty-two. Before this amendment, the statute had required troopers to complete twenty years' service in order to receive an annuity, with exception for annuities payable as a result of disabilities.

Under former *W.Va.Code* 15–2–27a [1988], retired state troopers who were receiving more than 8 percent of their aggregate salary from the fund were not allowed to collect the annuity adjustment until reaching age sixty-five. *W.Va. Code* 15–2–27a [1994] completely eliminated this restriction, and, as noted above, all retired members of age fifty-six or older may receive the cost of living adjustment.

26. We are aware, of course, that the salary increase and other benefits extended to the state troopers may not totally offset the increased contributions of certain high ranking troopers. We think this is a *de minimis* problem that should be corrected by the legislature at its next session.

Under the next amendment (*W.Va.Code* 15–2–27(c)(2) [1994] ), state troopers can no longer credit accrued, but unused annual leave and sick leave towards early collection of a pension before age fifty. According to respondents, despite the language of *W.Va. Code* 5–6–13(e), it was *not* the practice of either the old Public Safety Retirement Board or the Consolidated Public Retirement Board ["Board"] to allow state troopers to use annual and sick leave days at retirement in order to reach twenty-five years of service and thereby begin receiving pensions before becoming fifty. Instead, after the policy decision of the Board (discussed in footnote 4), the practice was allowed only between 25 January 1994 and 12 March 1994 [27]. The respondents also contend the practice of counting sick leave to allow increased payments did not begin until 1988, and, consequently, the petitioners enjoy no less advantage in this respect than they did six years ago.

Having examined the language of *W.Va. Code* 5–16–13(e) [1992], we find the provision does not allow state troopers to receive benefits before reaching age fifty. The provision simply entitles a retiree to collect additional money by using his or her accumulated, but unused annual and sick leave; it does not concern a state employee's eligibility for a pension as its last line makes clear: "such credited service shall not be used in meeting initial eligibility for retirement criteria, but only as additional service credited in excess thereof." Apparently, the Board misunderstood the clear use of the word "initial" that precludes troopers from receiving benefits before reaching age fifty. It is clear to us that "initial" serves to clarify the meaning of the first sentence regarding the use of annual and sick leave to allow larger, and not earlier, benefit payments.

█ Given our construction of *W.Va.Code* 5–16–13(e) [1992], we think the Board erroneously adopted its policy regarding troopers' use of accrued, but unused annual and sick leave. We find the state troopers had no legal right even before the statutory amendment in this case to apply their accrued, but unused leave to allow payment of a pension before age fifty. This Court, therefore, holds the legislature did not impair this part of the contract and we hold that because *W.Va.Code* 15–2–27(c)(2) merely clarified but did not change existing law, it is constitutional.

█ The last amendment, *W.Va.Code* 15–2–27a [1994], reduces the petitioners' retirement cost of living adjustment from 3.75 percent to 2 percent.[28] The respondents do not argue otherwise; instead, given the 1994 actuarial valuation of the public safety pension system, the respondents argue that this amendment preserves the future solvency of the fund. They also assert that the petitioners have a fiduciary duty to the remaining beneficiaries of the fund under *Dadisman.* We disagree.

█ Contrary to respondents' suggestion, this Court has never imposed a fiduciary duty upon the contributing members of a pension plan. *Cf.* Syl.Pt. 5, *Dadisman* (The PERS Trustees have the highest fiduciary duty to maintain the terms of the trust, as spelled out in the statute.) Requiring the petitioners to protect the future solvency of the pension system is an unconstitutional shifting of the state's own burden. Consequently, we find *W.Va.Code* 15–2–27a [1994] an unconstitutional impairment of the state's obligation of its contract but *only* to the extent that it reduces the petitioners' cost-of-living adjustment. *See,* doctrine of the least intrusive remedy, Syl. pt. 2, *Weaver v. Shaffer,* 170 W.Va. 107, 290 S.E.2d 244 (1982). It is a close question whether the doctrine of the least intrusive remedy is appropriate here; however, we believe that on balance it probably best comports with legislative intent. However, in light of this litigation, the legislature may amend this section to remove benefits that it gave in the last session of the

---

27. The Board discontinued the practice upon passage of the Amendment at issue on 12 March 1994.

28. As noted earlier, this Amendment also allows all state troopers to collect the annual cost-of-

living adjustment at age 56. *See* n. 24. In our above discussion, we are concerned only with the constitutionality of the Amendment as it involves the *reduction* of the cost-of-living adjustment.

legislature if, indeed, it was the intention of the legislature to tie those benefits inexorably to the reduction of the cost-of-living increase from 3.75 to 2 percent. Furthermore, the legislature may reduce the cost of living adjustment for all state troopers who have not yet substantially relied to their detriment.

Having read the actuarial studies submitted by respondents, this Court acknowledges the legitimacy of the respondents' concern regarding the future solvency of the public safety pension system. Nevertheless, our holding here still allows the legislature to purchase pension rights of some active employees. Furthermore, the legislature may completely amend pension benefits as they involve persons who may someday *in the future* enter into a public safety employment contract with the state.[29] In short, this Court holds the legislature simply cannot mess with the pension rights of state employees who have invested a substantial part of their working lives with West Virginia.

The reason that we have spoken at such length on the subject of government pensions is that increasingly courts are government's preeminent institutional memory. American society has become increasingly volatile, and our social failures in the last twenty years have led to a popular dissatisfaction that translates into pendulum-like changes in elected personnel at the polls. This is democracy and certainly nothing to be decried. But courts, with their life tenure (federal), long elected terms (West Virginia), or Missouri plan retention systems (many other states) are deliberately designed to provide continuity and memory.

Scores of thousands of little people have organized their lives around government pensions, and while in a democracy government has an opportunity for a new life and new direction every four years, these little people do not. While what was promised thirty years ago may not be of much concern to modernists elected to change the mix of government services, cut taxes, or instantiate a

new morality, what was promised thirty years ago forms the core of life for those who once upon a time believed their elected leaders.

Because we find *W.Va.Code* 15–2–26 [1994] (the increased contribution provision) and 15–2–27(c)(2) [1994] (the provision eliminating use of annual and sick leave to allow earlier benefits) [1994] constitutional, we deny petitioners relief with regard to these two provisions. However, to the extent that *W.Va.Code* 15–2–27a [1994] (the provision reducing petitioners' cost-of-living adjustment) impairs the obligations of contract under *W.Va. Const.* Article III, § 4, we grant a writ of mandamus ordering respondents to forbear in implementing that part of the amendment at issue here, and we order the respondents to reinstate the previous 3.75 percent annuity adjustment to which the petitioners were entitled before 1994.

Writ granted as moulded.

BROTHERTON, J., did not participate.

MILLER, Retired Justice sitting by temporary assignment, concurs in part, and dissents in part.

MILLER, Retired Justice, dissenting and concurring:[1]

(Filed Dec. 20, 1994.)

I cannot understand why the majority fails to follow our major pension cases that have been unanimously decided over the past fifteen years. They represent the majority view elsewhere. To abandon their teaching for the nebulous concepts contained in the majority opinion does nothing but confuse our pension law and invite unnecessary litigation.

We recognized the contractual nature of public employee pension rights in our earlier case of *Wagoner v. Gainer*, 167 W.Va. 139, 279 S.E.2d 636 (1981). There, the Legislature had amended the judicial pension act so as to prevent retired judges from receiving 75% of the salary received by an active

---

**29.** And, in fact, the legislature did this. *See* n. 6.

**1.** Pursuant to an Administrative Order entered by this Court on September 13, 1994, retired Justice

Thomas B. Miller was recalled for the September 1994 term because of the physical incapacity of Chief Justice W.T. Brotherton, Jr.

judge. This amendment precluded a retired judge from obtaining the pension benefit of a pay raise given to an active judge. We held that the amendment was unconstitutional and set these principles in syllabus points 1 and 3:

1. The West Virginia Retirement System for Judges creates contractually vested property rights for retired and active participating plan members, and these rights are enforceable and cannot be impaired or diminished by the State.

3. While the Legislature has the right to make reasonable alterations to the judicial pension fund, such alterations cannot impair the benefit level where there are extant statutorily-created inequities and special unfunded benefit provisions that affect the equal application of the law or the financial integrity or cost of the pension fund.

We expanded on these pension principles in *Dadisman v. Moore*, 181 W.Va. 779, 384 S.E.2d 816 (1988). There, a retired member of the Public Employees Retirement System (PERS) brought a writ of mandamus against the Governor and other officials charged with operating PERS. He claimed that their actions were contrary to the PERS statutes and were jeopardizing the fiscal integrity of the fund. In *Dadisman*, we reemphasized the point that employees in a public employee pension system have contractual rights, as has been generally held elsewhere:

In other jurisdictions, the modern trend and majority view is that a public employee's rights under a public pension statute are contract rights. 60A Am.Jur.2d *Pensions and Retirement Funds* § 1620 (1988); *see, e.g., Hanson v. City of Idaho Falls*, 92 Idaho 512, 446 P.2d 634 (1968); *Halpin v. Nebraska State Patrolmen's Retirement System*, 211 Neb. 892, 320 N.W.2d 910 (1982); *Singer v. City of Topeka*, 227 Kan. 356, 607 P.2d 467 (1980) (and cases cited therein); *State Teachers' Retirement Board of Giessel*, 12 Wis.2d 5, 106 N.W.2d 301 (1960).

*Id.* at 790, 384 S.E.2d at 827. This same principle as to the contractual nature of a public pension right has been reaffirmed in later cases from other jurisdictions. For example, the California Supreme Court in *Legislature of the State of California v. Eu*, 54 Cal.3d 492, 528, 816 P.2d 1309, 1331, 286 Cal.Rptr. 283, 305 (1991), made this statement:

Petitioners find ample support for their position in California cases confirming that both the federal and state contract clauses protect the vested pension rights of public officers and employees from unreasonable impairment. (Citations omitted).

*See also, Thurston v. Judges' Retirement Plan*, 179 Ariz. 49, 876 P.2d 545 (1994); *Davis v. Mayor and Alderman of City of Annapolis*, 98 Md.App. 707, 635 A.2d 36 (1994); *McDermott v. Regan*, 82 N.Y.2d 354, 604 N.Y.S.2d 890, 624 N.E.2d 985 (1993); *Hughes v. State of Oregon*, 314 Or. 1, 838 P.2d 1018 (1992); *Ass'n of Pennsylvania State College and University Faculties v. State System of Higher Education*, 505 Pa. 369, 479 A.2d 962 (1984); *Bowles v. Washington Dept. of Retirement Systems*, 121 Wash.2d 52 847 P.2d 440 (1993).

The basis for *Dadisman*'s contractual holding was that a pension is a form of property right which is analogous to a contractual claim, as we summarized in the syllabus:

15. "A 'property interest' includes not only the traditional notions of real and personal property, but also extends to those benefits to which an individual may be deemed to have a legitimate claim of entitlement under existing rules or understandings." Syl Pt. 3, *Waite v. Civil Service Commission*, 161 W.Va. 154, 241 S.E.2d 164 (1977).

16. Retired and active PERS plan participants have contractually vested property rights created by the pension statute, and such property rights are enforceable and cannot be impaired or diminished by the State.

We did recognize in *Dadisman* that where the pension was not vested, *i.e.*, the employee had not reached all the pension eligibility requirements, the Legislature might amend the system. In syllabus point 17 of *Dadisman v. Moore, supra*, we set out a general standard which allowed an amendment when

three conditions were met: (1) when the public interest requires it; (2) the amendment must be reasonable; and (3) reasonableness is determined by whether the amendment keeps the system sound and flexible:

> While the law recognizes that states retain some reserve power to modify by statute existing contractual pension relationships when the public interest so requires, such modifications must be reasonable and necessary to serve important public purposes. Legislative modifications to a pension plan must be reasonable, and the test for reasonableness is whether the alteration to the pension scheme serves to keep the system sound and flexible.

The *Dadisman* standard had been discussed earlier in *Wagoner v. Gainer, supra,* 167 W.Va. at 154, 279 S.E.2d at 645:

> Legislative modifications to a pension plan must be reasonable, and the test for reasonableness is whether the alteration to the pension scheme serves to keep the system sound and flexible. *Brazelton [v. Kansas Public Employees Retirement System,* 227 Kan. 443, 607 P.2d 510 (1980)]; *[Public Employees' Retirement Board v.] Washoe County,* [96 Nev. 718, 615 P.2d 972 (1980)] *Betts [v. Board of Administration of Public Employees' Retirement System,* 21 Cal.3d 859, 582 P.2d 614, 148 Cal.Rptr. 158 (1978)].

Much this same standard of reasonableness was drawn into syllabus point 3 of *Mullett v. City of Huntington Police Pension Board,* 186 W.Va. 488, 413 S.E.2d 143 (1991), where we indicated that, as to those employees whose pensions had not become vested, the "Legislature may amend the plan provided that any amendments survive a test of reasonableness". Vesting was used in the sense that the employees had not met the eligibility standards for retirement. Both *Mullett* and *Gainer* recognized, however, that where the pension was actually vested, then legislative amendments could not reduce the pension benefits. *Gainer* stated "[i]t is also clear that any alterations to the pension system can only affect the rights of active members...." 167 W.Va. at 152, 279 S.E.2d at 644. In *Gainer,* we summarized this princi-

ple, stating that "... courts have been willing ... [to allow] ... amendments to pension plans affecting non-retired, participating employees if the amendments are reasonable." 167 W.Va. at 151, 279 S.E.2d at 644. In *Mullett,* we quoted from *Campbell v. Michigan Judges Retirement Board,* 378 Mich. 169, 143 N.W.2d 755 (1966):

> The *Campbell* court explained in terms of contract law the effect of retirement on the appellant judges: "When they so retired and ceased to be members of the system, their contract was completely executed and their rights thereunder became vested." 143 N.W.2d at 757. Based on the vesting of the judges' contractual rights, those rights "could not, thereafter, be diminished or impaired by legislative change of the judges retirement statute."

186 W.Va. at 493, 413 S.E.2d at 148.

This same distinction exists in other jurisdictions between legislative alteration which affects a vested pension and one which is not completely vested because the employee has not met all of the eligibility requirements of the pension plan. The California Supreme Court in *Allen v. Board of Administration of Public Employees' Retirement System,* 34 Cal.3d 114, 120, 665 P.2d 534, 538, 192 Cal. Rptr. 762, 766 (1993), expressed this matter as follows:

> A constitutional bar against the destruction of such vested contractual pension rights, however, does not absolutely prohibit their modification. With respect to active employees, we have held that any modification of vested pension rights must be reasonable, must bear a material relation to the theory and successful operation of a pension system, and, when resulting in disadvantage to employees, must be accompanied by comparable new advantages. As to retired employees, the scope of continuing governmental power may be more restricted, the retiree being entitled to the fulfillment of the contract which he already has performed without detrimental modification. (Citations omitted).

Similarly, the Florida Supreme Court in *Florida Sheriffs Association v. Department of Administration,* 408 So.2d 1033, 1036 (Fla. 1981), made this summary of its pension law:

Although, by the foregoing decisions, this Court has stated that the legislature can alter retirement benefits of active employees, the Court has also expressly held that, whether in a voluntary or mandatory plan, once a participating member reaches retirement status, the benefits under the terms of the act in effect at the time of the employee's retirement vest. The contractual relationship may not thereafter be affected or adversely altered by subsequent statutory enactments. (Citations omitted).

*See also, Burlington Fire Fighters' Association v. Burlington,* 149 Vt. 293, 543 A.2d 686 (1988).

What emerges from our case law is essentially a two-tier test for modification of a public employees' pension plan. The first and most protected tier includes those public employees who have either retired or have met the eligibility standards for retirement. As to those individuals, any legislative amendment which reduces their retirement rights or benefits is unconstitutional because it violates the impairment of contract clause of both the federal and our state constitution.[2]

In the second tier are those public employees who are in a retirement system but have not met the eligibility standards to actually retire. They still possess a property or contract interest in their pensions system. However, the Legislature may make amendments to the retirement system but such amendments must meet the following standard: It must be shown that a substantial public interest dictates the need for the amendments. Moreover, the amendments must be reasonable in the sense that they will promote the flexibility and fiscal sound-

ness of the system and will not unduly burden the employees' pension rights.

While both *Wagoner* and *Gainer* referred to the constitutional impairment of contract principle in discussing the pension questions, they did not attempt any detailed discussion of this doctrine. We made a more thorough analysis in *Shell v. Metropolitan Life Insurance Company,* 181 W.Va. 16, 380 S.E.2d 183 (1989), where we reiterated this key element of the doctrine of impairment contracts in syllabus point 4:

In determining whether a Contract Clause violation has occurred, a three-step test is utilized. The initial inquiry is whether the statute has substantially impaired the contractual rights of the parties. If a substantial impairment is shown, the second step of the test is to determine whether there is a significant and legitimate public purpose behind the legislation. Finally, if a legitimate public purpose is demonstrated, the court must determine whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation' adoption.[3]

It is apparent that the fourth syllabus of *Shell* is analogous to syllabus point 17 of *Dadisman,* which has been earlier set out. *Dadisman* established the standard of when legislative amendments to a public pension system may be constitutionally permissible.

In *State ex rel. Dadisman v. Caperton,* 186 W.Va. 627, 413 S.E.2d 684 (1991), we relied on syllabus point 4 of *Shell* to sustain an amendment to PERS (the Public Employees Retirement System) which eliminated, for most accounting purposes, the distinction between the State division of PERS and the

---

2. The federal prohibition against impairment of contracts is found in Article 1, Section 10 of the United States Constitution, which states: "No State shall .... pass any ... Law impairing the Obligation of Contracts ..." In Article III, Section 4 of the West Virginia Constitution, a similar provision is found: "No ... law impairing the obligation of a contract, shall be passed."

3. Syllabus points 2 and 3 of *Shell* state:
2. "The clauses of the Constitution of the United States and the Constitution of West Virginia which forbid the passage of a law

impairing the obligation of a contract are not applicable to a statute enacted prior to the making of a contract." Syllabus Point 1, in part, *Devon Corp. v. Miller,* 167 W.Va. 362, 280 S.E.2d 108 (1981), *cert. denied* 455 U.S. 993, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982).

3. Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people.

non-state division.[4] It was claimed that the removal of this accounting distinction would impair the liquidity of the state component of PERS. We found that this accounting change had not changed the basic structure of PERS and concluded that there had been no substantial impairment of contract rights.

The majority mentions the impairment of contract clause of the West Virginia Constitution in its opinion. However, it neither cites *Shell* nor makes any attempt to discuss the law surrounding the doctrine of impairment of contract. As we pointed out in syllabus point 1 of *Shell*, our impairment of contract doctrine is patterned after the federal doctrine, which is contained in Article 1, Section 10 of the United States Constitution.[5] Moreover, as we pointed out in syllabus point 3 of *Shell*, which was based on United States Supreme Court cases, this doctrine is not an absolute bar to legislative modification of a contract.[6] It forbids a substantial modification. The majority completely avoids any analysis of this doctrine although it states this doctrine controls the constitutionality of the legislative amendments in this case.

The ultimate paradox in the majority's opinion is that, after endless hortatory discussions of the inviolability of employee pension rights, the majority then proceeds to find constitutional two of the three amendments made to the State Police Pension Fund which reduced the petitioners' benefits. If the majority had followed our existing pension law and applied our doctrine of impairment of contract, it would have had a rational basis to achieve its result. Instead, it has created the illusion of the sanctity of pension rights and in the end found that the rights could be altered by legislative amendments.

Indeed, under our existing pension law, I believe that the four petitioners in this case are entitled to greater protection of their pension rights than the majority extends. The respondents do not dispute that the four petitioners have at least twenty years of actual service with the Department, but less than twenty-five years. We are not informed of their ages. Under W.Va.Code, 15–2–27(b), a State trooper with twenty years of service, but less than twenty-five, can retire. The only proviso under this section is that such individual does not receive a pension check until he reaches age fifty.[7] However, I believe that under our old pension law, these individuals were sufficiently vested and that they were protected against any adverse change to their pension. Thus, this amendment which increased their contribution to the pension fund from 6% to 7½% on July 1, 1994, and 9% as of July 1, 1995, would be an unconstitutional impairment of their contract. Even to those members who were not fully vested, I would deem that a 50% increase in contribution levels is a substantial change in the contribution levels. This would violate the standard of reasonableness set out in syllabus point 17 of *Dadisman*. The Pennsylvania Supreme Court, in two cases, has

---

4. Under W.Va.Code, 5–10–2 and 5–10–16, PERS covers not only State employees, but also any political subdivision which elects to participate in PERS.

5. Syllabus point 1 of *Shell, supra,* states:

In construing our state constitutional provision prohibiting any "law impairing the obligation of a contract," W.Va. Const. art. III, § 4, we have generally accepted the United States Supreme Court's interpretation of the similar provision contained in Article I, Section 10, Clause 1 of the United States Constitution.

6. For syllabus point 3 of *Shell* see note 3, *supra.*

7. The applicable provisions of W.Va.Code, 15–2–27(b), are:

The retirement board shall retire any member of the division of public safety who has lodged with the secretary of the consolidated public retirement board his or her voluntary petition in writing for retirement, and

(3) Being under the age of fifty years has or shall have completed twenty years of service as a member of the division (excluding military service credit granted under section twenty-eight of this article).

\* \* \* \* \* \*

When a member has or shall have served twenty years or longer but less than twenty-five years as a member of the division and shall be retired under any of the provisions of this section before he or she shall have attained the age of fifty years, payment of monthly installments of the amount of retirement award to such member shall commence on the date he or she attains the age of fifty years.

found that much more modest increases in employee contributions were an unconstitutional impairment of contract. *See Pennsylvania Federation of Teachers v. School District of Philadelphia*, 506 Pa. 196, 484 A.2d 751 (1984), and *Association of Pennsylvania State College and University Faculties v. State System of Higher Education*, 505 Pa. 369, 479 A.2d 962 (1984).

The majority, in apparent defiance of its syllabus point 19,[8] and using what I consider to be a clever ruse, finds that because the Legislature gave all public employees a $1,008.00 pay increase and made some minor adjustments to the trooper pension fund,[9] it has extended a sufficient gain to render the increase in contributions constitutionally permissible.

In this same vein, I find the majority's syllabus point 22 to be fraught with the potential for abuse,[10] as it allows the Legislature to virtually annul every pay raise by diverting it into the employees pension fund by increasing the employee's percent of contributions to the fund.[11]

There are other syllabus points which are equally troublesome to me. For example,

syllabus point 20 suggests that "... the State may buy out the employee's contract property rights."[12] This can be done on a unilateral basis unless the employee has reached some level of reliance interest in the pension. However, the syllabus concludes that this "can be determined only on a case-by-case basis by the legislature and the courts." It is obvious to me that such a nebulous right, if exercised by the State on a unilateral basis, would incur an immediate constitutional challenge as violating the impairment of contract clause. The case-by-case determinations would obviously entangle the courts in endless pension litigation. I do not believe that the scheme proposed in syllabus point 20 does anything for those "who work for this State as troopers, secretaries and janitors and whose expertise is not in the law", of whom the majority is so solicitous. I suggest it would confound and confuse these people and result in their incurring needless legal expenses.

This same concern exists with regard to the majority's syllabus point 21, where "... the employee acquiesces in the change to the pension plan or unless the employee has so few years in the system that he or she has

---

**8.** The majority's syllabus point 19 states:

The pension rights of *all* current state pension plan members who have substantially relied to their detriment cannot be detrimentally altered at all, and any alterations to keep the trust fund solvent must be directed to the infusion of additional money. "Detrimentally alter" means the legislature cannot reduce the existing benefits (including such things as medical coverage) of the pension plan or raise the contribution level without giving the employee sufficient money to pay the higher contribution. Should the legislature seek to reduce certain advantages of a pension plan, it must offer equal benefits in their place as just compensation.

**9.** See the majority's note 24.

**10.** Syllabus point 22 states:

The legislature may increase a public employee's salary contribution to a pension plan if it gives a corresponding raise in salary or other benefits [sic] that offsets the public employee's increased contributions to the system. To be valid under *W.Va. Const.* Art. III, § 4, the additional salary or other benefits must at least cover the public employee's extra contribution to the system.

**11.** I have no quarrel with the majority's analysis of the judges' pay increase and increased pension contributions. There was a substantial increase beyond the amount taken for the increased contributions with an appropriate legislative funding in the pay bill. The $1,008.00 general pay increase had no such finding, and if a trooper earns $30,000.00 or more a year, there is really no pay increase.

**12.** Syllabus point 20 states:

Until an employee becomes eligible to draw a pension, his or her benefits can be determined on an actuarial basis, and until such time as the employee's reliance interest is so strong as effectively to preclude all other options, the State may buy out the employee's contract property rights. At some point, however, the worker has chosen to remain in public employment for such a substantial part of his or her life that the State can no longer purchase the employee's pension rights without the acquiescence of the employee. At what point in an employee's career it is no longer equitable for the State to buy back the employee's contract rights on a sound actuarial basis without confounding principles forbidding the impairment of contracts can be determined only on a case-by-case basis by the legislature and the courts.

not detrimentally relied on promised pension benefits." [13] Who will be the great vizier that will make this decision for employees?

What the majority's opinion has done is to create a vast Gordian knot in our pension law which will confound our public officials and our courts. If ever there was a reason for the doctrine of *stare decisis,*[14] this case is a shining example for its application. Not only has the majority confounded our existing pension law, but in the process has enabled the State to obtain greater flexibility to alter employee pension rights.

For the reasons stated, I dissent in part and concur in part.[15]

**13.** Syllabus point 21 states:

 Although the legislature may augment pension property rights, the legislature cannot simply reduce a participating employee's pension property rights once it establishes the system unless the employee acquiesces in the change to the pension plan or unless the employee has so few years in the system that he or she has not detrimentally relied on promised pension benefits.

**14.** The doctrine of *stare decisis* was discussed at some length in *In re Proposal to Incorporate Town of Chesapeake,* 130 W.Va. 527, 536, 45 S.E.2d 113, 118 (1947):

 The doctrine of stare decisis rests upon the principle that law by which men are governed should be fixed, definite, and known, and that, when the law is declared by court of competent jurisdiction authorized to construe it, such declaration, in absence of palpable mistake or error, is itself evidence of the law until changed by competent authority.

 \* \* \* \* \* \*

 [W]e are of the opinion *that, where property or other substantial rights have been acquired on the strength of court decisions, and where to overrule such decisions would create confusion and lead to litigation ... the doctrine should be applied.* (Emphasis added.)

 *See also, Oakley v. Gainer,* 175 W.Va. 115, 123, 331 S.E.2d 846, 854 (1985).

**15.** My only concurrence with the majority is its holding that application of the accrued vacation and sick leave provision under the Public Employees Insurance Act, W.Va.Code, 5–16–13(e), to enhance a retiree's credited service under W.Va.Code, 15–2–27, was improper.